93 Ill. App.3d 105 (1981)
416 N.E.2d 1212
In re S.M., a Minor.  (THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee,
v.
S.M., Respondent-Appellant.)
No. 79-1636.
Illinois Appellate Court  First District (4th Division).
Opinion filed February 5, 1981.
*106 James A. Stamos, of Chicago, for appellant.
Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Thomas A. Gibbons, Assistant State's Attorneys, of counsel), for the People.
Reversed and remanded.
Mr. JUSTICE JIGANTI delivered the opinion of the court:
On April 28, 1978, the minor respondent, then 14 years old, shot and killed two teenage boys and wounded two others in the parking lot of the high school which the boys attended. A petition for adjudication of wardship was filed charging him with the murder of Michael Truppa and Robert Paulish, with aggravated battery upon Michael Gale and Russell Peterson, and with unlawful use of a weapon. Prior to trial the respondent pleaded guilty to unlawful use of a weapon. Following trial he was adjudged delinquent for the commission of two counts of voluntary manslaughter and two counts of aggravated battery. A dispositional hearing was conducted and the respondent was committed to the Illinois Department of Corrections. He appeals, contending that (1) the State failed to prove beyond a reasonable doubt that he was not acting in self-defense; and (2) the trial court's dispositional order was contrary to the weight of the evidence or an abuse of discretion.
The State called 12 occurrence witnesses, all of whom were students at the high school at the time of the occurrence. The respondent also testified concerning the incident.
On the night in question there was a dance at the high school. The respondent did not attend the dance. Rather, he invited Barbara Siemasko, Sue Pederson, and Mark Keifer to his home. The four youths ate pizza and watched television until 9 p.m.
At about 9 p.m., the respondent told his friends that he had seen many raccoons at the DesPlaines River that afternoon. He asked Keifer whether he wanted to hunt the raccoons. Keifer stated that he did not want to go because he had a track meet the following day. After some discussion Keifer agreed to go along. The respondent then obtained a gun from his room. He strapped it on with a holster and covered it with a jacket.
The four youths left the respondent's house at approximately 9:45 p.m. They walked to Keifer's house where the respondent and Keifer *107 went inside to look for a flashlight to use while hunting. The boys then walked the girls to the high school so that the girls could call their relatives for a ride home.
The victims did not attend the high school dance either. Preceding the incident they played games at a bowling alley, drank beer in the Forest Preserves, and stopped to eat at a fast food restaurant. They then drove to the high school parking lot, apparently to see if any of their friends were there.
According to the State's witnesses, the respondent arrived at the high school at approximately 10 p.m. The dance was almost over. He stood on the sidewalk east of the school auditorium near the southern end of the parking lot, talking to a group of high school students. A little while later a station wagon carrying the victims drove past to the end of the parking lot and turned around. After turning around, the station wagon proceeded back toward where the respondent was talking to the other youths. Some of the State's witnesses testified that the station wagon was headed directly for the respondent at a steady rate of speed. Other witnesses testified that the station wagon would not have hit the respondent or the other youths even if it had not stopped. The respondent yelled "whoa, mother-fucker" or something similar.
Keifer, Siemasko, Pederson and four other high school students testified that after the car stopped the respondent apologized for the remark he had made. Gale was the only witness who testified that the respondent did not apologize. Other witnesses heard talking but were unable to hear what was said.
Gale got out of the station wagon and approached the respondent. The respondent backed away. Gale followed after him. Then the respondent pulled out his gun. Some of the witnesses saw him waving the gun in the air. Other witnesses stated that he cocked the pistol and pointed it at Gale. Gale yelled that the respondent had a gun. While this was occurring Truppa and another youth, Rick Johnson, got out of the station wagon. Some of the witnesses heard the onlookers yelling for Gale to leave the respondent alone.
The respondent continued to back up further into the parking lot. The lot was fenced in. Gale and Truppa followed him. After a while Paulish and Peterson joined Gale and Truppa. The respondent continued to retreat from the four boys but they pursued him. He was walking or running backwards. The other boys threw things at the respondent but missed hitting him. The objects thrown included a flattened tin can and a piece of asphalt. As he backed away the respondent was yelling for Gale, Peterson, Truppa and Paulish to "stay away." The respondent's back was to the parking lot fence. He was facing Truppa, Peterson, Gale and Paulish. They formed a semicircle around him.
*108 The defendant broke through the semicircle and started to run away from the four boys. Four witnesses heard the respondent yell "go get help." These four ran into the school to tell a teacher.
Gale, Johnson, and the respondent each testified that the respondent next fired a shot into the air. Peterson did not hear a warning shot. Peterson, Truppa, Gale and Paulish continued to advance upon the respondent.
The State's witnesses related four versions of the events that followed. Gale testified that he and the three other boys were running after the respondent. The respondent had his back to them. Peterson caught up along the respondent's right side. Peterson tried to grab the respondent and he reached for the respondent's gun. The respondent turned to his right and shot Peterson, who was about five feet away. The respondent continued turning to the right, shooting Truppa, Paulish and Gale in rapid succession. The latter three boys were approximately six feet from the respondent when shot. Gale did not stop running after Peterson was shot.
Peterson testified that he, Paulish, Truppa and Gale were jogging after the respondent. The respondent said, "I got a gun, I'll shoot." Peterson heard four or five shots in rapid succession. He was hit once in the left arm. At the time he was shot, Peterson was "about 10, 15 feet" from the respondent.
Johnson testified that he ran between two mobile buildings after the respondent fired the warning shot. He heard another shot and stepped out from between the buildings. He saw that Peterson had been shot in the arm. As he looked at Peterson's arm, Johnson heard another shot. He looked up and saw that Truppa and Paulish continued to run toward the respondent. Then Paulish was shot. Another shot followed immediately, and Truppa was hit. Before being shot, but after Paulish was shot, Truppa raised his leg and tried unsuccessfully to kick the gun from the respondent's hands.
Debbie Heider testified that at about 10:25 p.m. she left the high school dance. She saw Peterson, Truppa, Gale and Paulish chasing the respondent. She saw the boys form a semicircle around the respondent and saw him break through the semicircle and start to run toward the school. The four boys ran or "jogged" after the respondent. He yelled for help. Paulish, Gale, Truppa and Peterson grouped closer together as they ran. The respondent started to run faster. He was about 20 feet from the other boys. He turned around and fired four shots in rapid succession as he was running. Gale, Truppa, Peterson and Paulish were running after the respondent as they were hit.
At the time of the incident Truppa and Paulish were 16 years old. Gale and Peterson were 15 years old. The respondent was 14 years old. Gale had been on the wrestling team for two years. He was also on the *109 football team as were Truppa and Paulish. Gale, Truppa, Paulish and Peterson had known each other for many years. They were not acquainted with the respondent except that they had seen him around the high school. The respondent did not know any of the victims prior to this incident, except that Gale had once helped the gym teacher show the respondent's gym class how to wrestle.
The respondent testified on his own behalf. He also called seven witnesses who testified that he had a reputation in his neighborhood and at school for being a peaceful and law-abiding citizen. There was no evidence presented to rebut this reputation evidence.
The fact-finder may base a guilty verdict on the fact that he has believed the evidence presented by the State while finding incredible the evidence which would otherwise support the defendant's case. (See People v. Price (1979), 79 Ill. App.3d 1112, 398 N.E.2d 1158; People v. Lynch (1976), 43 Ill. App.3d 1039, 358 N.E.2d 17.) Therefore, for purposes of determining whether the respondent was found guilty beyond a reasonable doubt, we have presented the evidence in the light most favorable to the State.
It is not disputed that the respondent properly raised the issue of self-defense. Therefore, the dispositive issue is whether the State disproved beyond a reasonable doubt the respondent's claim of self-defense. People v. Woods (1980), 81 Ill.2d 537, 410 N.E.2d 866; People v. Shipp (1977), 52 Ill. App.3d 470, 367 N.E.2d 966.
 1 A person is justified in the use of deadly force when that person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself * * *." (Ill. Rev. Stat. 1977, ch. 38, par. 7-1.) As stated in People v. Motuzas (1933), 352 Ill. 340, 346, 185 N.E. 614, 617, "one who is deliberately assaulted in a manner to make him reasonably apprehensive" that he will suffer great bodily harm "has the right, under the law, to deliberately kill his assailant if it reasonably appears that such act was necessary, or apparently so, in order to save himself from great bodily harm."
Whether a person has acted in self-defense depends upon the surrounding facts and circumstances and is a question for the trier of fact. (People v. Woods.) However, this court must carefully review the evidence and has the duty to reverse a conviction where the record leaves us with a grave and substantial doubt of the guilt of the accused. People v. Lewellen (1969), 43 Ill.2d 74, 250 N.E.2d 651; People v. Goodman (1979), 77 Ill. App.3d 569, 396 N.E.2d 274.
Where the fact-finder concludes that the accused subjectively believed that the use of deadly force was necessary but that this subjective belief was unreasonable, then the proper verdict is voluntary manslaughter. (People v. Lockett (1980), 82 Ill.2d 546, 413 N.E.2d 378.) If that *110 subjective belief is found to be reasonable, then the accused should be acquitted on the ground that he acted in self-defense. (People v. Lockett.) In view of the fact that the respondent here was convicted of voluntary manslaughter, it is clear that the fact-finder concluded that the respondent subjectively believed that deadly force was necessary to prevent imminent death or great bodily harm to himself. Therefore, we need only consider whether the State has proved beyond a reasonable doubt that the respondent's belief was unreasonable.
The evidence; even when viewed in the light most favorable to the State, shows that the respondent tried to avoid a confrontation. He apologized for swearing and immediately retreated. Gale, who the respondent knew was a wrestler, pursued him. It appears from the evidence that the respondent apprehended that he would have trouble with Gale when he saw Gale get out of the car and advance toward him. Motivated by this apprehension the respondent showed that he was armed. That his fears were well founded is borne out by the appearance and conduct of Gale's three companions and by the fact that the boys were in no way discouraged by the respondent's gun. The respondent made repeated efforts to flee. At no time did he stand his ground or advance toward the other boys. Even after the four boys cornered the respondent and threw things at him, he did not shoot. Rather, he tried again to run away and called for the onlookers to get help. When the other boys continued to pursue him, the respondent fired a warning shot or made a verbal warning. According to the evidence the four boys continued to advance on the respondent even as they were shot.
Truppa, Peterson, Paulish and Gale were older than the respondent. Gale was on the wrestling team and played on the football team with Truppa and Paulish. All four boys had been drinking. The respondent was outnumbered 4 to 1. Under these circumstances we cannot say that the respondent's belief that he was in immediate danger of death or great bodily harm was unreasonable.
 2 The State, by its argument that the respondent could not have reasonably believed it necessary to "shoot four boys" implies that the shots fired subsequent to the one that hit Peterson were not justified. However, according to the evidence, Truppa, Gale, and Paulish continued to advance on the respondent even as they were shot. There was nothing to indicate that the danger to the respondent ended once Peterson had been shot. Further, where the initial use of force was justified, the claim of self-defense will not necessarily be negated by the fact that several shots were fired, or that the last shot was fired after the attack was over. (People v. Shipp (1977), 52 Ill. App.3d 470, 367 N.E.2d 966; People v. Bailey (1975), 27 Ill. App.3d 128, 326 N.E.2d 550.) Rather, where the accused was initially justified in firing, the claim of self-defense will be *111 negated only where the State establishes that the interval between the initial shot and the subsequent shots was sufficient to allow the accused, acting as a reasonable person, to realize that no further shooting was necessary. (People v. Bailey.) The party assailed is not expected to use infallible judgment in this regard. (People v. Shipp; People v. Bailey.) Here, the State's evidence was that the shots were fired in rapid succession. The State did not establish a sufficient interval between shots which would have allowed the respondent to realize he was no longer in danger.
 3 We believe that the evidence failed to prove beyond a reasonable doubt that the respondent did not act in self-defense. We therefore dismiss the judgment of the circuit court which adjudged the respondent delinquent for the commission of two counts of voluntary manslaughter and two counts of aggravated battery. The trial court's dispositional order committing the respondent to the Illinois Department of Corrections is vacated. The cause is remanded for dispositional hearing on the judgment of delinquency for the unlawful use of a weapon.
Reversed and remanded.
ROMITI, P.J., and JOHNSON, J., concur.