THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NORMAN BOSEK, Defendant-Appellant.

Second District No. 2—89—1151

Opinion filed March 18, 1991.

574

George Patrick Lynch, Ltd., of Chicago (George P. Lynch, of counsel), for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, Norman Bosek, was charged in a four-count indictment with the offense of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). Following a jury trial, defendant was found guilty of second degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—2). Defendant was sentenced to serve a term of six years' imprisonment in the Illinois Department of Corrections with a credit for time served. Defendant appeals, raising the following issues: (1) whether the jury was properly instructed on the presumption of innocence and burden of proof; (2) whether the defendant was proved guilty of second degree murder beyond a reasonable doubt; (3) whether the trial court erred in admitting evidence of uncharged crimes allegedly committed by the defendant against his family; (4) whether the trial court erred in failing to instruct the jury that it could consider evidence of the victim's violent and aggressive behavior; and (5) whether defendant's conviction was the result of his failure to receive competent and effective assistance of counsel. We affirm. A summary of the evidence at trial is set forth below.

For the State.

Brenda Cash testified that at approximately 12:10 p.m. on November 21, 1988, she arrived at Pratt Wayne Woods to meet a friend, Gary Smythe, for lunch. Smythe was already there, so she joined him in his car, a silver Thunderbird. She also noticed a brown or tan hatchback in the parking lot. The couple had talked for five or six minutes when the witness noticed that a blue car had pulled into the parking lot directly behind the tan hatchback. A man, later identified as the defendant, exited the blue car, with a gun in his hand, and stood in front of the driver's door. A woman, later identified as the defendant's wife, Janice Bosek, exited the passenger side of the tan hatchback and moved to the rear of the car. A man, later identified as the victim, Lucien Gilbert, exited the driver's side of the hatchback and also moved to the back of the hatchback. According to witness, Gilbert was dressed in a brown uniform.

The witness testified that the three individuals were standing one to two feet apart, the victim and Janice looking at the defendant. They were all angry and were arguing; defendant pointed a gun at the victim, who had nothing in his hands. The witness turned back to look at Gary, at his request, when she heard a pop sound, like a firecracker. She turned back to look and saw Janice grabbing the defendant's arm screaming for help. She then saw the defendant point the gun down. She could not see the victim at that time. She then heard two more pops. She estimated that 30 seconds elapsed between the first pop and the second two. Janice began to run towards the Smythe car yelling for help, at which point Gary began to back up his car so they could leave. As they left the parking lot, the witness observed the defendant running after Janice and also saw the victim face up on the ground, arms away from his body. She observed no weapon on the ground.

The witness testified further that, as Gary and she were reporting the shooting at the ranger's station, the blue car drove by. The witness told the ranger that the man driving the blue car had been involved in the shooting, and the ranger left to follow the blue car. Gary and she returned to the parking lot, where she observed Janice holding the victim's head and crying. The witness observed a rifle at the end of the victim's feet, perpendicular to the body.

On cross-examination, the witness denied seeing the victim lift the hatchback up and stated that she did not notice if it was up. She also admitted that she did not tell Gary that the defendant had a gun in his hand.

Gary Smythe testified that he arrived at the Pratt Wayne Woods at approximately 12:05 p.m. on November 21, 1988. A tan hatchback car was also in the parking lot. A man and a woman were seated very close together in the driver's seat. Smythe parked his car between 50 and 75 feet away from the tan hatchback. Smythe was joined by a friend, Brenda Cash, who sat in the passenger side of his car. A little while later, he heard a pop sound and noticed that the geese and ducks were flying away. He also observed that the time was 12:19 p.m. on his clock radio. Approximately 30 seconds later, he heard two more pop sounds and a woman screaming. He looked over his left shoulder and saw the victim lying on the ground. He also saw defendant standing about even with the head of the man lying face up on the ground. Defendant's right arm was pointed straight down, and his left arm was beckoning to Janice, who was about 20 feet from him walking back and forth. The witness saw no movement from the man on the ground. He also noticed a blue Lincoln automobile in the parking lot about 10 feet from the hatchback. Brenda and he reported the shooting as Brenda had testified, and then they returned to the parking lot. Brenda got in her car and left.

According to the witness, he went over to the hatchback and observed the victim, who had a rifle lying across his ankles, perpendicular to his feet. His feet were at the bumper of the car and his head away from the car. He did not observe the victim's arms because Janice was covering his body with hers.

On cross-examination, Smythe testified that he did not witness the shooting. Smythe also testified that the hatch of the hatchback was up. On redirect examination, Smythe testified that the blue Lincoln was about 10 to 15 feet back from the hatchback.

Kristian Johnson testified that on November 21, 1988, he arrived at Pratt Wayne Woods at approximately 12:20 p.m. As he pulled into the parking lot, he observed several vehicles, including a tan-colored Chevette hatchback and a silver Thunderbird. As he started to eat his lunch, he heard a cracking sound and noticed that all the geese flew into the air. He then looked to his left and saw the victim lying on his back and the defendant standing next to the victim, with a gun in his hand. The victim's feet were toward the rear of the Chevette, and his arms were at his side. He did not see a weapon either in the victim's hands or on the ground. The witness heard Janice, who was standing next to the Chevette, say, "I will go," or "I was going to go with you." The witness also observed a Lincoln Continental parked at an angle 10 to 15 feet behind the Chevette.

The witness testified further that after he heard the cracking sound, he started his car to leave the parking lot. As he was leaving the parking lot, he observed the defendant, who was standing a couple of feet away from the head of the victim, lower his arms, and he heard three or four more shots. He did not see any movement from the victim. Approximately 15 to 30 seconds elapsed from the time he heard the first cracking sound to the second set of shots. The witness then drove to the ranger station and reported the shooting. Two people in a silver Thunderbird arrived and made the same report. At that point, the blue Lincoln drove by, and the witness identified the driver for the ranger, who then pursued the Lincoln.

According to the witness, he then returned to the parking lot, where he observed Janice lying on the victim's body. He also observed a rifle lying across the victim's ankles, perpendicular to his body. The barrel of the rifle was pointing toward the victim's right side. The witness had not previously seen the rifle.

On cross-examination, Johnson admitted making a statement to the police that he could not be sure he saw a gun in defer lant's hands but that common sense told him that something had made the gunshot wounds. However, he testified that he did see a weapon in the defendant's hand.

Leo Eugene Vessling, a fire fighter-paramedic for the St. Charles fire department, testified that at approximately 12:29 p.m. on November 21, 1988, he and three other fire fighters-paramedics were dispatched to the Pratt Wayne Forest Preserve in Wayne. When he first observed the victim, the victim's feet were near the rear of the car, and he was face up. There was a large gun lying across the victim's right leg with the gun butt to his right and the barrel to the left, approximately midway between the knee and the ankle. The witness observed two wounds to the chest. Cardiopulmonary resuscitation (CPR) was begun on the victim, as well as other emergency procedures, and the victim was transported to Delnor Hospital in St. Charles.

On cross-examination, Vessling testified that the victim was dressed in a tan uniform. He did note that the hatch on the car was up but did not look inside the car. In a report he gave, he stated that the victim's arms were to his sides, but he was not sure where his hands were.

Michael Panacchia, a Du Page County sheriff deputy, testified that on November 21, 1988, he took photographs of the victim at Delnor Hospital. He identified the victim's clothing, which consisted in part of a uniform, combat boots, and a holster.

James Slowinski, a Du Page County sheriff's deputy, testified that at approximately 12:30 p.m. on November 21, 1988, he was dispatched to Pratt Wayne Woods to investigate a shooting. Upon arriving on the scene, he observed the victim lying on his back; he appeared to have two bullet wounds in the chest near the heart area. Near the victim's feet was a small compact vehicle with the hatchback open. Inside the hatchback, the witness observed a semiautomatic rifle and a revolver. Deputy Slowinski then located Officer Read of the Wayne police department, who told him that the person (the defendant) who had shot the victim was in Read's squad car. Slowinski asked the defendant to step out of the squad car, which he did. Slowinski frisked the defendant and asked him if the shooting was an accident. The defendant responded no and mumbled something else which the witness did not hear because his attention was directed elsewhere. Defendant was then placed in the backseat of Slowinski's squad car. Defendant was not handcuffed. According to the witness, defendant was in his custody, but he did not know if the defendant was under arrest.

According to the witness, defendant told him where the gun he used was located in his car. He noticed that the latch to the compartment where the gun was kept was stiff. Slowinski returned to the defendant, obtained his name, and gave him his *Miranda* warnings. Later when defendant was questioned at the sheriff's office, defendant stated that the victim had been threatening the defendant's son and that if he (the defendant) had waited a couple of seconds longer, he would have been the one lying on the ground.

On cross-examination, Slowinski testified that Officer Read was also present when the defendant denied that the shooting was an accident.

Thomas Read, police officer for the Village of Wayne, testified that, at approximately 12:30 p.m., he met the defendant at the corner of Railroad Street and Army Trail Road at which time the defendant told him that he had just shot a man in the forest preserve and indicated that he might still be alive. Officer Read described the defendant's demeanor as calm. Officer Read requested that defendant follow him back to the forest preserve. Upon arrival at the scene, Officer Read reported that he had a possible shooting and requested an ambulance. He placed the defendant in the backseat of his squad car. The victim was lying on the ground with his feet near the rear bumper of his car. The victim had no pulse and was not moving. Officer Read observed a revolver in the open portion of the hatchback. He also observed a rifle lying across the victim just above the ankles,

with the barrel across the victim's right leg. The victim's arms were out to the side with his elbows bent so that the upper arms were straight up.

According to the witness, defendant requested that he take pictures of the weapons. Once the paramedics arrived, he picked up the rifle and placed it in the rear of the open hatchback. A Du Page County sheriff's deputy arrived, and defendant was transferred into his squad car. Officer Read recalled that at one point the defendant mentioned a letter that he had found, but the officer could not remember the rest of what defendant said. He believed defendant was in his squad car when he made the statement. He was not in handcuffs, nor did Read ever tell the defendant that he was under arrest. The remark was not made in response to any question asked by Read.

On cross-examination, Officer Read testified that on September 19, 1988, he spoke with the defendant, who informed him that his wife was having an affair with Lucien Gilbert (the victim) and that he was afraid that, if Gilbert were at defendant's home that night, there might be trouble. According to the defendant, Gilbert had stated that they would "talk it out or shoot it out."

Al Gorski, police officer for the Du Page County forest preserve district, testified that at approximately 12:30 p.m. on November 21, 1988, he responded to a report of a shooting at the Pratt Wayne Woods Forest Preserve. When Gorski arrived on the scene, he spoke with George Malekovic, a Du Page County forest ranger, who pointed at the defendant as the individual who had done the shooting. Gorski observed the victim lying on the ground being worked on by the paramedics. As Gorski prepared to get a summary of what had happened for his report, he walked by the squad car where Malekovic was standing with the defendant. According to Gorski, Malekovic asked the defendant if it had been an accident. The defendant responded no, that he had come there with the intention of doing something like that. Gorski was no more than five feet from the squad car when he heard the exchange and wrote it down word for word. Defendant had not been physically restrained and did not appear to be in any emotional state.

Richard Vaughn testified that he is a detective-sergeant with the Du Page County sheriff's department assigned to the crime laboratory as a forensic scientist and that his specialty is the field of firearms and tool-mark identification. The parties stipulated that Vaughn be qualified as an expert in that field. Vaughn testified that defendant's .38 revolver had four fired rounds and one live round still in the chamber. The victim's .357 magnum had five live cartridges in it and

one empty chamber. The victim's rifle was an AKS 47 Russian assault-type weapon. It is a semiautomatic weapon which could be fired as quickly as someone could pull the trigger. The "banana" clip that was found with the rifle will accommodate 30 cartridges and that there were 29 cartridges in the clip. There were no cartridges in the chamber, and the safety was on. In order to discharge the rifle, the user would have to put the safety to a fire mode by moving the lever up, and then he would have to pull the bolt back and allow it to go forward and chamber any cartridge into the chamber.

On cross-examination, Vaughn testified that a person standing a few feet away from an AKS 47 would have no way of knowing if the gun was in a firing mode or not. It would also be impossible to tell at a distance of 8 to 10 feet that the AKS 47 was fully automatic or semiautomatic. According to Vaughn, if the AKS 47 was fully automatic, it would be fair to say that 30 rounds could be discharged in 2.7 seconds.

Vaughn also testified that the hydrostatic shock (killing power) released by the bullets causes damage to the organs not touched by the bullets themselves. The .38 would cause the least amount of hydrostatic shock and the AKS 47 the most amount of the three weapons he tested.

Dr. Paul Meyer, a board-certified orthopedic surgeon, was qualified as an expert in spinal trauma with particular expertise in the area of gunshot wounds to the spine. He testified that the bullet fired into the victim's back (the first shot) cut the victim's spinal cord at the T-4 level, entered the left lung and fractured the left clavicle. As a result of such injury, the victim would lose all muscle function and sensory function from the level of the spinal cord injury which would be at the level of the nipples all the way down to the tip of the toes. In other words, the victim would be rendered a paraplegic. Also, as a result of this injury, a large portion of the victim's sympathetic nervous system would also be lost, i.e., the body would not be able to respond to a major injury. Given the position of the rifle between the knee and the ankle of the victim, Dr. Meyer was of the opinion that the victim would not have been able to lift his body off the ground to reach the weapon. According to the doctor, the probability of survival with this type of wound is as high as 95%.

On cross-examination, Dr. Meyer testified that the victim would have been able to move his right arm. He further stated that an observer would not have any idea of the nature and extent of the injury just by looking at the victim lying on the ground.

On redirect examination, Dr. Meyer testified that if after sustaining the wound to his back, the victim had had the weapon on his right hand and his hand on the finger housing, he would have been able to aim, albeit grossly, and fire the rifle. However, the victim would not have been able to sit up, flex any muscles below the nipple level and would have had difficulty breathing.

Dr. Larry William Blum, board certified in forensic pathology, was qualified as an expert in that area. Dr. Blum testified that he performed an autopsy on the victim on November 21, 1988. In the course of the autopsy, he observed one gunshot wound to the back and two gunshot wounds to the left side of the chest. All three were entrance wounds; there were no exit wounds on the victim's body. Given the lack of "singeing" or actual stippling of gunpowder on the wounds or the victim's clothing, the shots were fired more than two feet away from the victim. The second two gunshots passed through the victim's heart and were consistent with the victim lying on his back when he received the second two shots. Dr. Blum also testified that the victim's blood-alcohol level was .22. In Dr. Blum's opinion, the victim died of hemorrhagic shock due to gunshot wounds in the chest. The gunshot wound to the victim's back contributed to his death, although it was not the type of wound that is invariably fatal. Although persons have survived gunshot wounds to the heart, the probability of survival from such would be virtually none.

Judy Zdrubecky, Janice Bosek's sister, testified that around the end of February or beginning of March 1988, Janice and Lucien Gilbert had a relationship. During the summer of 1988, she became aware that they were seriously contemplating marriage.

The witness testified about a birthday party for Janice that was given by Gilbert, which the witness attended together with her mother and several friends. The morning after the party, Judy went to Janice and the defendant's home in Wayne. She observed that the flowers which Janice had received at the party the night before had been smashed and were scattered all over the driveway. She then testified that the defendant, Janice and she had a conversation in which Janice stated she wanted a divorce, and the defendant refused to give her one. According to the witness, defendant further stated that he was not going to let Gilbert take his wife, his kids, his money or his house. The telephone rang, and defendant proceeded to have a heated conversation with the caller, who was Gilbert. After he hung up, the defendant stated that he was going to kill that "son-of-a-bitch."

The witness testified further that she knew Gilbert socially and that he came to her house a couple of times a month, usually with

Janice. Judy was not nervous or anxious about having him in her house.

On cross-examination, Judy testified that she had seen Gilbert with a holster on, but it was empty. Gilbert did show her husband a gun he owned. During the telephone conversation between Gilbert and the defendant, she was under the impression that Gilbert was coming over to the defendant's house to settle the matter with the defendant, Janice and himself.

On redirect examination, Judy testified that Gilbert never acted in a particularly aggressive or violent nature, but was a very kind and polite person. Gilbert's relationship with Janice was a very positive one. On re-cross-examination, Judy did not remember Gilbert threatening the life of her brother, Phil Rysinka.

Janice Bosek, wife of the defendant, testified that she has been married to the defendant for 26 years and they have five children ranging from 24 to 11. At the present time, she lives in Wayne. Previously the family had lived in Downers Grove for 19 years. She was introduced to Lucien Gilbert by her oldest son, Michael, in January 1988. After the initial meeting, she saw Gilbert on other occasions both with and without her husband. Their friendship expanded, and Gilbert started writing her letters and telephoning her when her husband was not home. At that time, defendant and Janice had purchased a new home in Wayne. Defendant was staying at the home in Wayne with Janice residing in Downers Grove with the children. By June 1988, the relationship had become a sexual one, and Gilbert and she began to discuss marriage, which would have taken place in September 1989. According to Janice, Gilbert had contacted two divorce lawyers and placed funds in both their names. However, the day they planned to see a lawyer about her divorce, defendant stayed home from work, and she was unable to keep the appointment.

Janice further testified that certain of her family members were aware of her relationship with Gilbert before the defendant was. In October 1988, she informed defendant that Gilbert wanted to marry her. After receiving this information, defendant disabled her car (the blue Lincoln Continental) and fixed the telephone in the house so that she could not make telephone calls. He also began coming home during the day at different times, supposedly to have lunch with her. She continued to receive letters, about 12 a week, from Gilbert and would call him when she could get to a telephone. Until the last two weeks before his death, Gilbert would give her the letters, she would read them and return them to him. During the last two weeks before he died, Gilbert mailed his letters to her because there was no way else

to get them to her. They did not see each other during the last two weeks prior to Gilbert's death. Gilbert never threatened the defendant in her presence, but he did say that if the defendant ever came after him, he would shoot him in the legs in self-defense.

Janice testified further that on the morning of November 21, 1988, she borrowed her daughter's car to go to a public telephone to call Gilbert because the Lincoln did not run, and the telephone was not working. Gilbert wanted her to report the matter to the police; they argued, and she hung up on him and returned home. At approximately 10:30 a.m., Gilbert arrived at her house. He was carrying a gun in the holster he was wearing, and she asked him to remove the gun. That was the only time she had seen him with a handgun on his person. He ordinarily kept it in a blue box. The previous August, the defendant and Gilbert had compared handguns. She went upstairs to finish dressing, and, when she returned, she saw a rifle lying on her kitchen table, and she told Gilbert to put it away.

Janice then testified that Gilbert and she left the house in his car (the tan Chevette hatchback). He took her to the Wayne police station. They waited in the police station, but there was no one available right away to take a report. She was so nervous that she ran out of the police station. She suggested that they wait at Pratt Wayne Woods and then return to the police station. They arrived at the forest preserve at approximately 11:30 a.m. They just sat in the car talking and kissing.

Janice further testified that at approximately 12:20 p.m. she noticed that her blue Lincoln was approaching and stated, "There's Norm." The Lincoln was parked about 10 feet from the Chevette. Gilbert got out of the car. She heard defendant and Gilbert talking and then she got out of the car and ran to the back of the Chevette. She observed the doors of the Lincoln were open and the defendant standing where the backseat of the Lincoln was. Defendant's hand, which held a gun, was at his side. The hatchback of the Chevette was up and Gilbert was leaning into it. When she saw the gun in defendant's hand, she yelled that she would go home. Defendant then raised the gun and pointed it at her for five seconds and then pointed it at Gilbert. She told the defendant not to shoot. Defendant then shot Gilbert in the back. Gilbert fell to his knees and ended up on his back with his arms up. Defendant was about three feet from Gilbert's head as he lay on the ground. She said to the defendant, "You didn't shoot him, did you?" Defendant did not answer, but Gilbert shook his head indicating he was shot. There was no other movement from Gilbert's body.

Janice further testified that she began running to a car for help. She then hesitated and ran back to where the defendant was standing and stood behind and to the right of the defendant. Defendant was standing between the Lincoln and the Chevette, closer to the Chevette. Defendant raised his gun at which point she said, "Don't give him more," and tried to grab his arms. Defendant then fired two more shots. About 30 seconds had elapsed between the first shot and the second two. She then ran up to a car, but the driver backed the car away and out of the parking lot. She returned to where the victim lay and removed the cigarette out of his mouth and moved his arm closer to his body. There was a rifle lying across the victim's legs, just below his knees. She tried to get it off his leg but only moved it an inch or two. At this point, defendant asked her to go to the Wayne police station with him, but she refused.

Janice also testified that defendant had purchased his gun 10 to 15 years before for their boat. In June 1988, she had found the gun loaded, in defendant's dresser. Because of the children, she had Gilbert tell her how to disarm it, and she hid the gun and the bullets. A week later, she returned it to the defendant without the bullets, which she kept hidden. She also stated that the latch on the compartment on the door of the Lincoln was hard to open.

On cross-examination, Janice testified that when she first met Gilbert, she thought he was divorced but, in fact, his divorce did not become final until February 1988. She stated that Gilbert was three years younger than she and looked young for his age. She described him as very kind, nice, with good manners. Both her mother and sister, Judy, liked him. Judy would act as a "cover" for Gilbert and her. She admitted that Gilbert had sent her a list of 49 women with whom he had had a sexual relationship.

Janice testified that Gilbert was not employed much during the time she knew him and that he drank beer all the time, including the morning. She saw him smoke marijuana twice. On November 21, 1988, Gilbert had beer in a Tupperware container. She also stated that Gilbert liked to wear a bandanna around his head, a trait he had picked up in Vietnam. She denied that Gilbert wore army fatigues or army boots.

Janice testified as to an extensive correspondence with Gilbert. She related some of the phrases Gilbert would use in letters from him to her such as "shoot out at the O.K. Corral," and "I have had to kill people for real." In a letter to her son, Michael, Gilbert stated, "I'll will give him a war that he won't believe even when it's happening." She stated that Gilbert did not like to be called "Rambo" but that it

was her pet name for him. They would also call each other "Jason" and "Marie" or "Clyde" and "Miss Bonnie Parker" after movie characters.

Janice identified a letter dated March 8, 1988, wherein she stated that she loved Gilbert. She testified that it was in May 1988 that a sexual relationship developed between Gilbert and her, and the letters they wrote each other afterwards contained explicit references to their sexual relationship. She also identified letters which indicated that a divorce was discussed in July 1988, as well as a letter from Gilbert in which he expressed anger that she was reluctant to leave her husband. When she stated that she wanted Gilbert to "Fix it," she meant that Gilbert should go to bed with her, not to eliminate the defendant.

Janice further testified that defendant wanted to save their marriage. The weekend of September 16, 1988, after she had told him that she wanted to marry Gilbert, was spent discussing their marriage. She identified a letter she wrote to Gilbert after that weekend in which she questioned whether she had the right to destroy her family for her own needs and wanted time to think. She also identified two letters from Gilbert which indicated that he loved her and he would leave if she wanted him to.

Janice then testified that on September 19, 1988, defendant may have told her that Gilbert had called him at his office and threatened him, but she did not remember what she said to the defendant at that time. She would sometimes get letters from Gilbert indicating that he was breaking up with her because of her indecisiveness, and then she would get a love letter from him. After her request for a divorce, the defendant started being especially nice to her, trying to buy her back, but she felt it was too late. After one call from Gilbert to the defendant, defendant told her he was going to the police to report he was being threatened by Gilbert. She called Gilbert and told him not to come over.

Janice also testified that in October 1988 Gilbert had a birthday party for her, attended by her mother, her sister, Judy, and some friends. Gilbert gave her flowers which she brought home. After finding out where she had been, defendant threw the flowers, gifts, etc., all over the driveway of their house. It was after that incident that defendant cut off her transportation and communication. Defendant had previously used these methods to keep her restricted.

Janice identified a letter in which Gilbert described an incident in which a school bus driver had cut him off and said if he found the guy, he was going to beat him up because he had nearly killed the children

on the bus and claim self-defense. She also identified another letter written in November 1988 in which he threatened her brother, Phil Rysinka, for "bad mouthing" Judy and Janice. She also identified a letter from Gilbert to her son, Michael, in which Gilbert asked Michael to cooperate in obtaining some medical records for several years before. She was aware that Michael did not want to obtain the records. She was also aware that Gilbert wrote another letter to Michael after he refused to get the medical records. In that letter, November 16, 1988, Gilbert stated that he had killed people for real and would not be intimidated by Michael, who did not know what it meant to cut a man's throat or blow a man's head off.

Janice testified further that on November 19, 1988, defendant and she attended a party at Len and Gail Clark's. Defendant was being very attentive to her, and she called people's attention to that fact. She knew that Gilbert had reported to the Wayne police that she was being physically abused. Defendant had struck her once since she had met Gilbert. During the course of their marriage, defendant had dominated her, while Gilbert left her with the impression they would have an equal partnership.

Janice testified that she did not tell anyone that defendant pointed the gun at her because no one asked. She agreed that in none of the statements she gave after the incident was there any mention by her that defendant pointed a gun at her. She did not remember if the clip was in the rifle. She never mentioned to the police that she moved the victim's hands or the position of the rifle.

On redirect examination, Janice testified that she had told Gilbert that the defendant was abusive to the children and had once beaten Michael to the point he missed school. Defendant had also hit their other children, as well as herself. After defendant smashed her flowers, he ripped the banister and threw it into the foyer, and when she tried to call the police, he threw the telephone at her. In October 1988, she warned Gilbert that if she filed for divorce, she would be signing his death warrant. She also stated that Gilbert had gotten angry with her brother, Phil, for calling Judy a slut.

According to Janice, Gilbert told her that Michael threatened to get 20 people after him. Gilbert also told her that defendant was going to shoot him but that he would not because he had too much to lose.

For the defense.

The defendant testified that he is a mechanical engineer and has been employed by Fermi National Accelerator Lab for 11½ years. He has been married to Janice for 26 years, and they have five children.

Janice did not work outside of the home since the birth of their first child, Michael. The family resided in Downers Grove until they moved to Wayne in June 1988. The home in Wayne was purchased in December 1987. The defendant began moving things into the Wayne house during the early months of 1988, and he stayed at the house two nights a week. During their marriage, Janice and he had never separated for any prolonged period of time or sought a dissolution of their marriage.

Defendant testified that he met Lucien Gilbert in January 1988 when defendant's son, Michael, introduced them and saw him socially several times after that. In August 1988, Gilbert was in the backyard shooting a .357 revolver. Defendant told him that it was against the law to discharge the revolver and that he did not want him shooting it in his backyard. They then discussed guns, and defendant showed him the .38 revolver that he had. In the summer, Gilbert was usually dressed in combat boots, khaki tan pants, and a bandanna around his head. He also had a hunting knife and a gun in his belt.

Defendant testified further that in June 1988 there was friction between Janice and him and she began sleeping in a different room. On September 16, 1988, Janice told him that she wished to marry Gilbert. On September 19, 1988, defendant received a telephone call at work from Gilbert, who informed him that he was in love with Janice, that the defendant and he would settle it with guns or knives and that they would have a "Shootout at the O.K. Corral." Gilbert then shouted profanities and said he was coming to get the defendant. Defendant hung up the telephone and called the Wayne police department, where he reported the incident to Officer Read. He informed Janice that he had received a threatening call from Gilbert. He then put five bullets in his .38 revolver. He had never discharged the revolver prior to November 21, 1988. Defendant then attempted to win Janice back by being nice to her, buying her gifts and taking her out to dinner.

Defendant testified that approximately 2½ weeks after the September 19, 1988, telephone call, he received another call from Gilbert at home. Gilbert again threatened him and stated that he was coming out to get the defendant right away. Defendant then attempted to contact the police. Janice informed him that she had called Gilbert, and he was not coming over. Defendant put his gun in his pocket and walked around for about an hour. About three weeks later he received another threatening call from Gilbert at home. After that, when Gilbert called, defendant hung up on him. Gilbert called 20 times. Defendant denied threatening Gilbert either verbally or in writing.

Defendant further testified that on Janice's birthday, which was October 22, 1988, Janice did not return home until 10:45 p.m. She had a box of roses which she told defendant came from Gilbert. Defendant became upset and threw the roses on the ground. They continued to argue, but defendant denied throwing the telephone at Janice. He admitted pushing on the banister, and it broke. After that incident, he disabled the telephone and her car because he did not want her to communicate with or see Gilbert. He also started coming home for lunch.

Defendant further testified that early in November, his son, Michael, showed him a letter he had received from Gilbert. The letter asked Michael to obtain Michael's medical records from seven years previous and then give them either to Janice or Gilbert. Defendant left it up to Michael to decide what to do. A few days later, Michael told the defendant that he had a telephone communication with Gilbert about the medical records. On November 19, 1988, defendant was attending a party at the Clarks' and received a telephone call from Michael. According to Michael, he had received another letter about the medical records. On November 20, 1988, Michael showed defendant and Janice the letter he had received from Gilbert. Janice accused Michael of threatening Gilbert. Defendant told Michael they should put the matter in the hands of an attorney.

Defendant further testified that on November 21, 1988, he returned home from work at approximately 11:30 with some beef sandwiches he purchased for lunch with Janice. Janice was not at home so defendant went out to look for her. He also stopped by the post office and picked up their mail, which included a letter addressed to Janice, which he opened and read. It was a love letter from Gilbert to Janice. He returned to the house but decided he could not return to work without finding out where Janice was. Thinking that Gilbert might be at the house when he returned and that there might be a confrontation, he placed his .38 revolver in the left-door compartment of the Lincoln. He drove by a restaurant and then decided to check the Pratt Wayne Woods. Upon entering the first parking lot, he saw Gilbert and Janice in a tan Chevette. Gilbert made eye contact with him and got out of the car and walked slowly toward the back of the Chevette. Defendant pulled about 15 feet behind the Chevette and got out of his car. About five seconds later, Janice got out of the Chevette. Defendant then noticed that Gilbert had opened the hatchback of the Chevette and had pulled out a rifle with a clip on it. Gilbert's left hand was on the front stock of the weapon. Although Gilbert's back was to him and he was 10 to 15 feet away, defendant saw

him twist or turn a lever on the rifle. Defendant described the rifle as a machine gun. Defendant opened the compartment on the door and removed his gun. He took a step around the side of the car door, aimed, and shot at Gilbert as fast as he could.

Defendant further testified that after he shot at Gilbert, Gilbert fell back on his behind, the rifle resting on his knees, and then he fell over on his left elbow, with his arms to the sides of his body. Defendant then saw Janice run back and forth hysterically. He then saw Gilbert take his hand off the pavement, slide it down his right leg, and reach for the rifle. Defendant then aimed his gun at him and pulled the trigger until it would not fire any more. Defendant then ran around his car because there was no indication that Gilbert had been shot, except that he was lying on the ground. He then tried to convince Janice to go with him to get the police, but she refused to go. Defendant then left the scene and located Officer Read. He told Officer Read that he had just shot someone and to call an ambulance. He then led Officer Read back to the scene. When they returned to the scene, he asked Officer Read to take a picture of the rifle. They also noted the .357 magnum revolver in the open hatchback. Two squad cars arrived, and defendant was placed in a squad car. Officer Slowinski asked him if it was an accident, and defendant told him no. Defendant denied saying that he had come to the forest preserve with the intention of doing something like this. Defendant also denied pointing the gun at Janice.

On cross-examination, defendant testified that until September 1988 there was no animosity between Gilbert and himself. He was upset when Janice told him she wanted to marry Gilbert. Although Gilbert had threatened to come over to get the defendant, he had never carried out those threats. Defendant had handled other guns before, such as pellet guns and shotguns. He disconnected the telephone and the car to keep Gilbert from brainwashing Janice. November 21, 1988, was the first time Janice was not home when he came home for lunch. He brought lunch home that day because he felt sorry for her. Although she felt she was a prisoner, he had only made it inconvenient for her to travel or talk on the telephone.

Defendant further testified that the medical records of Michael's which Gilbert and Janice were seeking had to do with a fight defendant had had with Michael seven years ago, as a result of which Michael had to seek medical attention. Michael missed two days of school and wore a patch over his eye for two days.

Defendant further testified that he never stated to Janice and Judy that he was going to kill Gilbert. On November 21, 1988, he

thought there was a 50-50 chance Janice was with Gilbert. He had driven his truck to work that day and had to fix the Lincoln in order to drive it. He entered the front parking lot of the forest preserve to turn around. He had no idea that Gilbert and Janice would be in the forest preserve. When he opened the car door, he shouted to Janice to come to the car, that he was taking her home. He never heard Janice say that she would go home with him. He clearly saw the barrel of the rifle and the clips. He saw Gilbert turning a lever and then he shot him. He did not kick the rifle out of Gilbert's hands because he was too far away. Gilbert moved his hand off the pavement and got within four inches of the trigger before the defendant shot him again.

Defendant further testified that there were a lot of people around when Officer Slowinski asked him if it was an accident. Defendant denied making any other statements other than "No."

Karen Verna Birks, the former wife of Lucien Gilbert, testified that she was married to Gilbert from 1975 to 1988. During their marriage, Gilbert was unemployed 50% of the time. He drank alcohol quite a bit which led to problems with his employment. He had an antique gun collection, but, otherwise, she never permitted guns in the house. After they separated, Gilbert rented the house next door, and, on one occasion, she observed him wearing a holster with a gun in it. Twice she had to call the police when Gilbert came over uninvited, but no complaints were filed.

On cross-examination, Karen testified that during their marriage Gilbert never wore a holster around the house. She never saw him dressed in any fatigues. He had a bad temper when he was drinking. Gilbert was not aggressive, although he was a talker, and it was limited to talk. She never saw him in a fight or threatening to kill anyone. The times Gilbert came over uninvited were to see their dog.

Thomas Lynch testified that until November 1988 he was employed by Jenkins Security. In June 1988, Gilbert was hired, and Lynch was his supervisor for part of the time. Lynch observed Gilbert drinking on the job and carrying a firearm which he was not permitted to do. He also set booby traps around the construction site which was not proper security procedure. Gilbert was eventually fired for his use of unauthorized firearms and reporting to duty with alcohol on his breath. Lynch also contacted the Naperville police department because of death threats Gilbert was making against people on the construction site.

On cross-examination, Lynch testified that the only reason that he did not like Gilbert was that he carried his gun all the time. On redi-

rect examination, Lynch testified that Gilbert's nickname at Jenkins was "Rambo."

Gail Clark testified that defendant and Janice attended a party at her home on November 19, 1988. Prior to the party, a man who identified himself as Lucien Gilbert telephoned. He telephoned again one-half hour before the party began. She also testified that she had known defendant and Janice for 15 years and that they seemed to have a good relationship.

Michael Bosek, the 24-year-old son of the defendant and Janice, testified that he met Lucien Gilbert in November 1987 and introduced him to his family. In the spring of 1988, he noticed that Gilbert was present at his family's home quite a bit even when he was not present. After the family moved to Wayne, Michael got his own apartment. When he visited the home in Wayne, Gilbert would be there with Janice. Gilbert would be dressed in camouflage or khaki green clothes and have a red bandanna on, and he wore a shoulder holster with a 12-inch Bowie knife.

Michael testified that in November 1988 he received a letter from Gilbert requesting his medical records, to which he did not reply. Gilbert called him at work and demanded the medical records. Because he was afraid, Michael gave Gilbert the impression he could have the records. He interrupted Janice's telephone conversation with Gilbert telling him that he knew what Gilbert was trying to pull and that there were going to be 20 people really upset by it. Michael denied telling Gilbert that 20 people were going to come after him physically. He discussed the letter with his father and told him he was afraid. Shortly after the telephone conversation, he received another letter from Gilbert. He was so upset by the letter he called his father at the Clarks' party and told him that he was afraid that Gilbert would come after him. The letter had stated that Gilbert was going to send him a hand grenade. After he showed the letter to his parents, the defendant was going to set up an appointment with an attorney. Michael denied making any threats against Gilbert.

On cross-examination, Michael testified that he was unhappy about the thought of a divorce between his parents.

Following closing arguments, the jury deliberated and returned a verdict, finding the defendant guilty of second degree murder. Defendant was sentenced as indicated above, and this appeal followed.

Defendant contends, first, that he was deprived of his rights to due process when the trial court failed to instruct the jury as to the presumption of innocence and the State's burden of proof beyond a reasonable doubt on second degree murder.

■ Defendant concedes that he failed to object to the omission he now complains of at the time the jury instructions were tendered, nor did he offer any instructions to remedy the alleged deficiencies. It is well established that the failure to object at trial to an asserted error in jury instruction waives the question, and no party may raise on appeal the failure to give an instruction unless he tendered it at trial. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 543.) Defendant argues that he, in fact, has preserved the error by raising it in his post-trial motion. However, subject to certain exceptions not applicable here, to be preserved, error must be objected to at trial and be raised in a post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176.) One of the exceptions to the waiver rule in *Enoch* is if plain error has occurred. Inasmuch as we conclude the jury was properly instructed, no such error occurred.

■ In Illinois, a person commits second degree murder when he commits the offense of first degree murder and either of two mitigating statutory factors is present. The statutory factor applicable in this cause is that, at the time of the killing, the defendant believed the circumstances to be such that, if they existed, they would justify or exonerate the killing but his belief was unreasonable. The statute goes on to provide as follows:

"(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code [self-defense]. In a jury trial for first degree murder in which evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented and the defendant has requested that the jury be given the option of finding the defendant guilty of second degree murder, the jury must be instructed that it may not consider whether the defendant has met his burden of proof with regard to second degree murder until and unless it has determined that the State has proven beyond a reasonable doubt each of the elements of first degree murder." Ill. Rev. Stat. 1987, ch. 38, par. 9—2.

■ In *People v. Shumpert* (1989), 126 Ill. 2d 344, our supreme court explained the second degree murder statute as follows:

> "Under the old homicide statute, the State had the burden to prove, beyond a reasonable doubt, the elements of murder. [Citation.] The defendant then had the opportunity to present evidence of a factor in mitigation, serious provocation or unreasonable belief, either of which must have been present to reduce an offense of murder to voluntary manslaughter. [Citation.] The State then had the burden to prove, beyond a reasonable doubt, the absence of the factor in mitigation. [Citation.] Under the new Act, the State still bears the burden to prove, beyond a reasonable doubt, the elements of first degree murder. [Citation.] However, the defendant now bears the burden to prove, by a preponderance of the evidence, one of the factors in mitigation which must be present to reduce an offense of first degree murder to second degree murder. [Citation.] Thus, the new Act not only requires the defendant to come forward with *some* evidence of a factor in mitigation; it requires the defendant to prove, *by a preponderance of the evidence*, a factor in mitigation. Furthermore, the State is no longer required to prove, beyond a reasonable doubt, the absence of the factor in mitigation." (Emphasis in original.) *Shumpert*, 126 Ill. 2d at 351-52.

■ It is not disputed that the jury in this cause was properly instructed as to the presumption of innocence and the burden of proof beyond a reasonable doubt as to the offense of first degree murder. There is no requirement that the jury be further instructed as to the presumption of innocence and burden of proof as to the offense of second degree murder because in order for the jury to reach the issue of whether the defendant is guilty of second degree murder, it must already have found him guilty of first degree murder beyond a reasonable doubt.

■ Finally, we note that section 9—2(c) states the burden of proof remains on the State to prove the absence of circumstances which would "justify or exonerate the killing under the principles stated in Article 7 of this Code [justifiable use of force]." (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(c).) In this case, the defendant claimed self-defense. The jury was instructed in this cause that one of the elements the State must prove beyond a reasonable doubt is that the defendant was not justified in using the force which he used. We agree with the State's argument that an unreasonable belief in self-defense, as defined in section 9—2(a)(2), is not the same as a reasonable belief in self-defense and is not an element the State must disprove. Defendant's

reliance on *People v. Reddick* (1988), 123 Ill. 2d 184, and *People v. Brooks* (1988), 175 Ill. App. 3d 136, is misplaced for in those cases the courts discuss the State's burden under the prior voluntary manslaughter statute.

■■ We conclude that, inasmuch as the jury was properly instructed, plain error did not occur, and the jury instruction issue is therefore waived.

Next, the defendant contends that the evidence at trial proved beyond a reasonable doubt that he acted in self-defense when he killed Lucien Gilbert.

■■ ■ A person is justified in the use of deadly force when that person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." (Ill. Rev. Stat. 1987, ch. 38, par. 7—1.) Whether a person has acted in self-defense depends upon the surrounding facts and circumstances and is a question for the trier of fact to determine. (*In re S.M.* (1981), 93 Ill. App. 3d 105, 109.) However, the court must carefully review the evidence and has the duty to reverse a conviction where the record leaves us with a grave and substantial doubt as to the guilt of the defendant. (*In re S.M.*, 93 Ill. App. 3d at 109.) Under the prior statute, when the jury concluded that the defendant subjectively believed that the use of deadly force was necessary but that his subjective belief was unreasonable, then the proper verdict was voluntary manslaughter. (93 Ill. App. 3d at 109.) The jury in the present cause found the defendant guilty of second degree murder, which is similar to the offense of voluntary manslaughter. Thus, we need only consider whether the defendant's belief was unreasonable. 93 Ill. App. 3d at 110.

We have set forth the evidence in this cause in great detail, particularly the testimony of the witnesses to the shooting of the victim by the defendant. The State's version of the shooting was that the defendant shot Lucien Gilbert as Gilbert stood facing the open hatchback of his car with his back to the defendant. After Gilbert fell to the ground, defendant fired two more shots into his body, which proved to be the cause of Gilbert's death. The State's witnesses did not see a rifle until after the shooting, nor did they see Gilbert move after the first shot. The defendant's version was that Gilbert had reached into the hatchback to take out a rifle which he then appeared to load. Defendant shot first, believing, given Gilbert's past threats to him, that he was about to be killed by Gilbert. After the defendant shot Gilbert and he had fallen to the ground, defendant then fired at him again because he saw Gilbert's hand move toward the trigger of the rifle.

The defendant's version is consistent with his theory of self-defense. The State's version, if believed, established that Gilbert was not going to fire his rifle at the defendant or even if he intended to, after the first shot, he was either unable or did not, in fact, reach for the rifle as he lay on the ground.

The jury in this cause chose to believe that while the defendant believed he needed to shoot Gilbert in self-defense, defendant's belief was unreasonable and that defendant was, thus, guilty of second degree murder. We are of the opinion that there is no basis for disturbing the jury's rejection of the defendant's theory of self-defense.

Next, the defendant contends that the trial court erred in rejecting his requested instruction relating to evidence of Lucien Gilbert's aggressive nature. The tendered instruction read as follows:

"Evidence of the victim's aggressive and violent character may be considered by you along with the other facts and circumstances to show who was the aggressor."

The trial court refused the instruction on the grounds that it singled out one aspect of the case, it was a non-Illinois Pattern Jury Instruction (IPI) and that the point was adequately covered by other IPI instructions.

In *People v. Sequoia Books, Inc.* (1987), 160 Ill. App. 3d 315, this court upheld a trial court's refusal to give a non-IPI instruction and one which we felt singled out and unduly underscored the importance of one particular piece of evidence. (*Sequoia Books, Inc.*, 160 Ill. App. 3d at 322-23.) Moreover, a non-IPI instruction should be used only if a pattern instruction does not contain an accurate instruction on the subject upon which the jury should be instructed. (160 Ill. App. 3d at 322.) The jury in this cause was instructed as to the justifiable use of force by the defendant and that they had to find beyond a reasonable doubt that he was not justified in using the force he used in order for him to be found guilty of first degree murder. The fact that the ample evidence of the victim's aggressiveness and threatening nature was considered by the jury is reflected in the fact that defendant was found guilty of second degree murder rather than first degree murder, *i.e.*, defendant could believe that force was necessary given the victim's aggressive nature, but under the circumstances, the belief was unreasonable.

Defendant's reliance on *People v. Lynch* (1984), 104 Ill. 2d 194, is misplaced, as *Lynch* is distinguishable from the case at bar. In *Lynch*, our supreme court held that when a theory of self-defense is raised, evidence is relevant to show who is the aggressor. (*Lynch*, 104 Ill. 2d at 200.) *Lynch* does not discuss the giving of non-IPI instructions on

the issue of a victim's aggressive nature and therefore is not authority for the giving of such an instruction. As previously stated, the defendant was permitted to introduce evidence of Gilbert's aggressive nature, as well as the threats he communicated to the defendant, unlike the situation in *Lynch*. The defendant cites no other authority which requires the giving of a non-IPI instruction on this point. Therefore, we conclude that the trial court did not err in rejecting defendant's tendered instruction.

Next, the defendant contends that the trial court erred in admitting evidence of uncharged crimes and alleged violent acts committed by the defendant. The complained-of testimony consisted of statements that Michael had to receive medical attention as a result of the altercation with the defendant.

■ The general rule is that evidence of crimes not charged in the indictment is inadmissible. (*People v. Barbour* (1982), 106 Ill. App. 3d 993, 999.) However, our supreme court has held that evidence of other crimes committed by the defendant may be admitted if relevant to establish any material question other than the propensity of the defendant to commit a crime. (*People v. Stewart* (1984), 105 Ill. 2d 22, 62.) Evidence of other crimes is admissible if it is relevant to establish any fact material to the prosecution. *Stewart*, 105 Ill. 2d at 62.

Defendant relies on *People v. Bouska* (1983), 118 Ill. App. 3d 595. In that cause Bouska was convicted of the offense of aggravated battery of his girlfriend, Susan Forsberg. On appeal, Bouska contended that the trial court had erred in refusing to admit evidence of his continued relationship with her after the alleged beating had taken place. The reviewing court upheld the trial court's decision barring the evidence, holding that the evidence in question would shed no light on whether Bouska beat Mrs. Forsberg and that the admission of such evidence would draw the jury away from the important issue of whether Bouska was guilty of aggravated battery.

We note that it was the defendant who first raised the subject of the medical records in cross-examination of Janice. On redirect examination by the State, Janice testified concerning Michael's need for medical attention as the result of an altercation with his father. Under questioning by his attorney, defendant testified as follows:

> "My son [Michael] had received a letter from Gilbert wanting him to go to a medical center that we had taken him to seven years previous when he and I had a fight and he wanted my son to obtain medical records and give them to [Janice]."

On cross-examination, defendant was questioned as to what medical records Janice and Gilbert were seeking to obtain from Michael.

Defendant explained again that he and Michael had had a fight and Michael had had to seek medical attention afterwards.

 ██ When an accused has interjected an issue into a case, he cannot then argue it was error for the State to bring the issue to the jury's attention. (*People v. Ortiz* (1987), 155 Ill. App. 3d 786, 794.) The testimony elicited by the State was virtually identical to what the defendant testified to on direct examination. Therefore, we find no error in the admission of the testimony concerning why Michael needed to seek medical attention.

The defendant also complains that in its closing argument the State characterized him as an individual who physically and emotionally abused his wife, Janice. Defendant maintains that there is no evidence that he physically abused Janice. However, Janice testified that defendant hit her and their children. She further testified that he had disabled her car and the telephone, facts which certainly could be argued as emotional abuse toward Janice by the defendant. Interestingly enough, defendant, though denying the existence of the testimony, argues that it should have been excluded by the court.

 We note that none of the complained-of testimony was objected to and, therefore, any objection to it is waived. (*People v. Romano* (1985), 139 Ill. App. 3d 999.) Moreover, the State's efforts to show that the defendant was less than the perfect family man corresponded to the defendant's efforts to point to the victim as a "macho Rambo-type aggressor" who was breaking up the defendant's "perfect home life." We conclude therefore that no error occurred in the admission of the complained-of testimony.

Finally, defendant contends that he received ineffective assistance of counsel which resulted in his conviction.

 ██ In *People v. Albanese* (1984), 104 Ill. 2d 504, our supreme court adopted the standard for reviewing claims of attorney incompetence set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. Under that standard, the defendant must prove that counsel's representation fell below an objective standard of reasonableness, that as a result he was deprived of a fair trial and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Albanese*, 104 Ill. 2d at 525.) A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant, and when it is easier to dispose of an ineffectiveness claim on the ground of lack of prejudice, that course should be followed. 104 Ill. 2d at 527.

Defendant argues that defense counsel failed to file a motion to suppress statements he made to Officer Slowinski. Slowinski asked the

defendant whether the shooting was an accident, to which the defendant responded, "No." Later, defendant told Slowinski that his gun was in the compartment on the driver's door of his car. Defendant maintains that he was in custody and had not received his *Miranda* warnings at the time he made the statements.

Contrary to defendant's argument on appeal, the admission of his statement "No" did not destroy his theory of self-defense. Obviously if it was in self-defense, the shooting was not an accident. Defendant denied saying anything other than "No." Further, it is clear from the record that defendant "volunteered" the location of his gun and was not responding to a question posed by Slowinski.

■■ ■ Traditional investigatory functions of the police, including general on-the-scene questioning in the fact-finding process, where the compelling atmosphere inherent in the process of in-custody interrogations is not present, are exempted from protection under *Miranda*. *(People v. Thompson* (1971), 48 Ill. 2d 41, 44.) Neither of the complained-of statements was protected under *Miranda* and, therefore, the defense counsel's decision not to bring a fruitless motion to suppress was not error.

■■ Defendant then argues that defense counsel failed to object to highly prejudicial testimony concerning the defendant's character, specifically the incident between the defendant and his son, Michael. Although we acknowledged counsel's failure to object to this evidence, we also found that that evidence was properly admitted as a response to defendant's presentation of himself as a "good family man" whose home was being broken up by "Rambo." Thus, even had proper objections been made, the testimony would have properly been admitted.

Next, defendant argues that defense counsel failed to object to hearsay testimony and only made approximately 25 objections, only five of which are substantive, during a seven-day jury trial. Defendant relies on *People v. Royse* (1983), 99 Ill. 2d 163. In that case, our supreme court reversed Royse's conviction when his defense counsel objected only three times in the course of a three-day trial, thus allowing the prosecution's witnesses repeatedly to give damaging hearsay testimony, to offer their opinions, to summarize conversations without adequate foundation, and to volunteer incriminating information about other drug transactions that were not involved in Royse's trial.

■■ ■ At one point in the instant case, the trial court noted that the defense counsel's strategy was not to object much and let in a lot of information. Defendant must overcome the presumption that the acts or omissions he complains of are sound trial strategy. (*Albanese* (104 Ill. 2d at 526, citing *Strickland v. Washington* (1984), 466 U.S.

668, 689-90, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065-66.) Defendant does not point out with any particularity which hearsay statements he is complaining of or how he was prejudiced by their admission. Moreover, it appears that defense counsel's strategy resulted in defendant's conviction of second degree murder as opposed to the more serious first degree murder. We are of the opinion that defense counsel's failure to object was but trial strategy and successful trial strategy, rather than an omission, which led to defendant's conviction.

Next, defendant argues that defense counsel erred by failing to have two letters, one written by Janice and one written by Lucien Gilbert, admitted into evidence. Part of Janice's letter was, in fact, admitted, but when the State objected to portions of the letter, on the basis it contained sexual references that had no place in the trial, defense counsel indicated he had no great problem with not having those portions of the letter admitted. The trial court refused to admit Lucien Gilbert's letter, again due to the sexual nature of the letter, although the letter did go to show Gilbert's deteriorating mind. The trial court found it was not probative of the issues at trial.

██ Defendant contends that, without these letters in evidence, the jury was left with the impression that Janice and Gilbert had a "pristine and beautiful *extra-marital* affair." (Emphasis in original.) As to Gilbert's letter, the record is clear that defense counsel offered it into evidence, it was objected to by the State and, after argument, the trial court refused it. The fact that the trial court ruled against the defense counsel is not error on counsel's part under these circumstances. Further, the refusal of the trial court to admit the "sexual" portions of Janice's letter was proper in that such a letter would divert the jury's attention improperly from the facts of the murder case to the sexual adventures of Janice and Gilbert. (See *People v. Bouska* (1983), 118 Ill. App. 3d 595.) Thus, no error occurred in the failure to admit the letter into evidence.

██ Finally, the defendant contends that the cumulative effect of defense counsel's errors deprived him of his right to effective counsel. Inasmuch as we have found that defense counsel was not ineffective, we conclude that defendant's final issue has no merit.

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

INGLIS and NICKELS, JJ., concur.