THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DATHEL LOLITA SHIPP, Defendant-Appellant.

Second District   No. 76-368

Opinion filed September 19, 1977.—Rehearing denied October 12, 1977.

Ralph Ruebner, Peter B. Nolte, and Rosetta Hillary, all of State Appellate Defender's Office, of Elgin, for appellant.

William E. Sisler, State's Attorney, of Freeport (Phyllis J. Perko and Martin Moltz, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

Defendant was charged with the offenses of murder, voluntary manslaughter, and unlawful use of weapons. After a jury trial, she was acquitted of murder and unlawful use of weapons, but convicted of voluntary manslaughter. She appeals contending that the State failed to prove beyond a reasonable doubt that she could not reasonably have believed that her action in shooting the decedent, Robert Shipp, five times with a .38 caliber revolver, was necessary in order to prevent her death or the infliction of great bodily harm upon her. Under the bizarre facts in this case, we conclude that she is correct in this contention.

For the most part, the facts are undisputed. The decedent, whom defendant had known since she was a young girl, had been convicted of voluntary manslaughter in 1952 for killing his first wife, and sentenced to 10 to 20 years in the penitentiary. In 1962, the decedent was released on parole and defendant entered into a "business relationship" with him, by working as prostitute, while he served as her pimp. In 1965, defendant determined to give up prostitution. The decedent reacted by going to

defendant's parents' home (where defendant had been staying) and breaking in. There, he cursed the defendant, pulled out a gun, and shot her in the left shoulder. Defendant's mother attempted to intervene, and the decedent told her to "shut up, or else I'll kill you, too." He then shot defendant again, this time in her hip, and dragged her from the bedroom, in spite of the courageous efforts of defendant's mother to stop him. As defendant struggled, the decedent shot her a third time in the face. Somehow, she managed to escape and ran out of her mother's house and up the street as decedent continued to fire at her, hitting her again, twice. She ran into a tavern and locked herself in the restroom. The decedent followed and attempted to get the restroom door open. He was unsuccessful and fired two shots through the door. These shots missed defendant, who had "pinned herself" against the wall. The police arrived and arrested the decedent, who subsequently pleaded guilty to a charge of attempted murder, and received a sentence of 8 to 15 years in the penitentiary.

Strangely, this incident did not end defendant's relationship with the decedent. In fact, defendant corresponded with the decedent and visited him regularly while he was serving his sentence for attempting to murder her. After the decedent was released in 1972, he and the defendant began living together, and the two were married the following year.

Not surprisingly, their marital relationship was less than idyllic. On a number of occasions the decedent became violent during arguments and beat the defendant, and on one occasion, the defendant had to be hospitalized with a broken rib, as the result of such an incident. The defendant subsequently suffered a nervous breakdown and obtained a divorce from the decedent in August of 1975.

According to the defendant's trial testimony, the decedent continued to harass her after their divorce, forcing her to engage in sexual activity, and threatening her; several times, he "pulled a gun out." After one incident, the defendant swore out a warrant against the decedent for trespass, but later dropped the charges because she "cared so much" for him. On October 31, 1975, the decedent attempted to force the defendant to go home with him and hit her in the forehead, causing a scar, when she resisted. The defendant stated that she then went to see her attorney, who obtained a court order restraining the decedent from harassing, annoying or talking to her. In spite of all of this, the defendant and the decedent were together on January 20, 1976, and had dinner at a restaurant. There they got into an argument and refused to pay for dinner. After the police arrived there was a scuffle, during which the defendant was observed trying to kick the decedent, and was seen to push him toward a cigarette machine. The decedent was arrested for disorderly conduct, aggravated battery, and resisting arrest.

On January 23, the defendant encountered the decedent at a local V.F.W. bar. When two other patrons began fighting, the defendant went outside and the decedent followed her. There the two argued and the decedent produced a knife and threatened to "cut" the defendant's face "where nobody would be able to recognize [her]." He told her that he'd "just cut [her] throat and go back to the penitentiary." He grabbed the defendant by one arm and began forcing her into his car. Fortunately, the police arrived and arrested the decedent for assault.

About 10 days later, on the evening of February 3, 1976, the defendant shot and killed the decedent. At 8:30 p.m. she had again gone to the V.F.W. bar. Before going inside she checked to make certain that the decedent's car was not in the parking lot. However, after entering the V.F.W., she saw the decedent sitting at the end of the bar. Defendant nonetheless remained, talking to a number of other women who were present. Then, on a sudden impulse, she propositioned Selmon Hall, a friend of the decedent's, for prostitution, in spite of the fact that the decedent had told her that he would kill her if he ever caught her with another man. Her testimony was that she had "made up her mind that she was going to show [the decedent] that she could be with somebody if she wanted to."

The defendant and Hall left the V.F.W., went to the home of Jeff Manning, and went upstairs to a bedroom. Shortly afterward, the decedent appeared at the downstairs door where he was confronted by Manning. Manning told the decedent that he shouldn't come in since "she [defendant] didn't want to be bothered no more." Manning said that the decedent was drinking from a pint bottle of gin, seemed angry, and spoke for the most part in a loud voice; however, the decedent replied, "Jeff, I'm your friend. I ain't going to cause no trouble." The decedent then pushed past Manning and went upstairs to the room where the defendant and Hall were.

When the decedent entered the room, Hall became so terrified that he attempted to crawl underneath the bed. Since Hall was, apparently, a large man, this effort was not successful and Hall testified at trial that the decedent told him "I'll take care of you and I'll take care of [the defendant]." A statement which Hall had given police was used by the prosecutor in an attempt to impeach Hall. According to that statement, Hall had told police that the decedent had said, "I'll take care of you and then I'll talk to her," but Hall said that this was not correct.

After the decedent had assaulted the defendant on January 23, 1976, the defendant obtained a revolver which she kept in her purse. The defendant had placed this weapon on the dresser. When decedent entered the room, the defendant "got hysterical," and began reciting the terms of the court order to the decedent. The decedent said, "I want to

talk to you, man," and began edging toward her; he had one hand in his coat pocket. The defendant picked up the revolver, cocked it, pointed it at the decedent, and told him, "Please don't come any closer." The decedent continued to advance and the defendant began backing up. The decedent said, "If you want to shoot me, go ahead and shoot." The defendant told him not to take his hand out of his coat, since she thought that he had a weapon of some sort. The decedent did not move his hand, but continued his advance toward the defendant. The defendant backed up until she was in the corner of the room. When the decedent was within six feet of her, she "knew then that [she] had to shoot him," or else decedent "would take that gun away" from her and "beat and shoot her." She testified that, "I remember pulling the trigger, and he kept coming, so I kept shooting. I couldn't stop." The defendant fired five shots. The decedent was hit in the abdominal area, the groin, twice in the side (one of these bullets severed the aorta), and once in the back. Death was caused by "acute heart failure." Defendant testified that the decedent continued to advance toward her, after being hit by the initial round, but "whirled" and sank to the floor after being hit in the groin. She admitted that she fired at least one round into him after he began falling to the floor, explaining, under cross-examination, "That's when I was firing the gun and I told you that I couldn't stop." When Hall testified at trial, he was confronted with his statement to the police, in which he stated that the decedent said, "Why did you do that?" to the defendant after she shot him. He said that he was no longer sure whether the decedent had actually made such a statement or not.

After the shooting, Hall was so frightened that he left the scene and ran three or four blocks through the snow, without his coat or shoes. The defendant also left the scene, and threw the revolver into a river. She took two tranquillizers, and had her father drive her to the police station. At the station she gave a number of statements to various officers, which were generally consistent with the events as set forth here, and with her testimony at trial. She told one of the officers, "You know, it's been coming to this for a long time. I was either going to kill [the decedent] or he was going to kill me," and "I have been threatened and beaten so many times, I couldn't take it anymore."

■■ Under cross-examination the defendant admitted that in 1971, she fired a pistol into the air above Donald Woods, to whom she was then married to "scare him off," and that in 1975, she had assaulted a prostitute who was working for the decedent, with a carving knife. The prosecutor also asked the defendant if she had shot Herman Shipp, the decedent's brother, in 1965. The defendant denied shooting Herman Shipp, and the State never introduced any evidence on the point. Though no objection was made to the prosecutor's questioning at trial, the defendant has

contended on appeal that this cross-examination was improper, and mandates a new trial. While, under our view of this case, it is not necessary for us to explore this assertion, we note that it is highly improper for a prosecutor to raise an unsupported insinuation on cross-examination, as was done here where the prosecutor raised the serious matter of the defendant's shooting of Herman Shipp, but made no effort to introduce supporting evidence. (*People v. Nuccio* (1969), 43 Ill. 2d 375.) It seems highly probable that this improper cross-examination had a prejudicial effect upon the jury.

■■ However, the dispositive question here is whether the State disproved the defendant's claim of self-defense, beyond a reasonable doubt. In view of the verdict, it is conceded by both the State and the defendant that the jury found that the defendant actually believed that her employment of deadly force was necessary to prevent her death or suffering great bodily harm, but that this belief was unreasonable. (See *People v. Limas* (1977), 45 Ill. App. 3d 643, 651.) A court of review will not substitute its judgment for that of the jury on questions of fact, *e.g., People v. Patrick* (1977), 46 Ill. App. 3d 122, 123. Nonetheless, it is our duty to review the evidence and determine whether it shows the guilt of the defendant beyond a reasonable doubt; where the record leaves the court with a grave and substantial doubt of the guilt of the defendant, the judgment of the trial court will be reversed. *People v. Lewellen* (1969), 43 Ill. 2d 74, 78.

Where a claim of self-defense is presented in a murder case, evidence of the violent disposition of the deceased, or threats directed at the defendant by the deceased, have probative value in establishing that the defendant reasonably believed that the employment of force likely to cause death or great bodily harm was necessary to prevent the killing or infliction of great bodily harm upon the defendant. (*People v. Stombaugh* (1972), 52 Ill. 2d 130.) Here, the evidence of the decedent's violent disposition and prior threats could hardly have been stronger. Not only had the decedent been convicted of killing his first wife, and of attempting to murder the defendant, but he had brutally assaulted the defendant on a number of other occasions. He had made numerous threats against her life, including a chillingly calculated statement on January 23, 1976, as he held her at knife-point, that he would simply cut her throat and then go to the penitentiary. Against this backdrop, the decedent's threat to kill the defendant if he ever caught her with another man was highly credible. Although the defendant's action in leaving the V.F.W. with Selmon Hall was thus extremely irrational, unless viewed as a calculated effort to lure decedent to his death (a theory which the jury evidently rejected), there can be no question, not only that (as the jury found) the defendant *actually* feared death or great bodily harm when

decedent entered the bedroom and confronted her and Hall, in his view, *"flagrante delicto,"* but also, that such fear was highly *reasonable*, under the circumstances.

■■■ Other evidence amplified this conclusion. The defendant heard the decedent "scuffle" with Manning, as he pushed his way into the house. The decedent threatened to "take care of" Hall, after entering the bedroom, and Hall stated that the decedent said he would "take care of" the defendant,· as well, though this testimony was contradicted by an earlier statement which he gave to the police. The decedent, who weighed 190 pounds, continued to advance upon the defendant, even after she told him to stop. Though the State has emphasized that no weapon was found on the decedent's person, that fact is not dispositive in the context of this case, since the defendant did not know whether or not decedent had a weapon and the decedent had the ability to inflict great bodily harm upon the defendant, even without a weapon (see *People v. Reeves* (1977), 47 Ill. App. 3d 406), and it is the defendant's perception of the danger, and not the actual peril, which was dispositive. (*People v. Limas* (1977), 45 Ill. App. 3d 643.) The stark terror manifested by Hall, who had known the decedent for six years, provided further evidence that the defendant's fear was reasonable. In sum, it is clear from the record that the defendant's belief that deadly force was necessary to protect herself from death or great bodily harm, was justified under the circumstances.

■■■ The State argues that the defendant "over-reacted" when she fired five times at the decedent. The record would support a finding that the defendant continued to fire at the decedent, after he had ceased to advance toward her. This court has held that a person is not justified in shooting his antagonist "after the latter has been disarmed and disabled." (*People v. Limas* (1977), 45 Ill. App. 3d 643, 652.) We reiterate that holding, but decline to apply it in a mechanical manner to cases with highly different facts. *Limas* involved a brief struggle on a stairlanding between the defendant and another man, whom defendant could not reasonably have believed to have been armed. The defendant in *Limas* knew nothing of the reputation of his alleged assailant, and there was no history of threats between the parties; further, the assailant was not shown to be of superior strength to that of the defendant. Nonetheless, the defendant in *Limas* shot his assailant four times. We held that, under such circumstances, the defendant could not have reasonably feared death or great bodily harm after the "assailant" was struck by the first bullet. In the instant case, defendant had been shot, beaten, assaulted and threatened by the decedent, and was aware of the fact that decedent had killed his first wife. The decedent was physically far larger and more powerful than the defendant, and continued to advance upon her even after she began

firing at him. Her terror was both reasonable and complete, and only a matter of seconds elapsed between the firing of the first and last round. Where the initial use of deadly force was justified, a claim of self-defense will not necessarily be negated by the fact that several shots were fired, or that the last shot was fired after the attack was over, since the party assailed is not expected to have perfect judgment. (*People v. Chapman* (1977), 49 Ill. App. 3d 553, 557; *People v. Bailey* (1975), 27 Ill. App. 3d 128.) Under these circumstances, the evidence will not support a finding, beyond a reasonable doubt, that the defendant continued to fire at the decedent after she reasonably should have realized that he was disabled. See *People v. McGraw* (1958), 13 Ill. 2d 249; *People v. Shields* (1974), 18 Ill. App. 3d 1080 (abstract).

After a review of all of the record, we are left with a grave doubt as to the defendant's guilt. It is therefore our duty to reverse the judgment of the circuit court of Stephenson County.

Judgment reversed.

SEIDENFELD and NASH, JJ., concur.