2025 IL App (1st) 221305-U

No. 1-22-1305

Order filed April 3, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 765 |
| | ) | |
| TREY HAMILTON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction and sentence for second degree murder are affirmed over his contentions that the State failed to prove he did not act in self-defense and his sentence is excessive.

¶ 2    Following a bench trial, defendant-appellant Trey Hamilton was found guilty of second-degree murder (720 ILCS 5/9-2(a)(2) (West 2016)) and sentenced to 15 years' imprisonment. On appeal, he argues that the State failed to prove he did not act in self-defense. Alternatively, he argues his sentence is excessive. For the following reasons, we affirm.

## I. BACKGROUND

¶ 3

¶ 4    Mr. Hamilton was charged by indictment with first-degree murder for shooting and killing Michael Wickliffe. He filed an answer indicating he would raise the affirmative defense of self-defense.

¶ 5    At trial, Derricka Black testified that, on May 20, 2016, she was at a "get-together" thrown by Diamond Jones. Mr. Hamilton and Mr. Wickliffe were there.[1] Other attendees included Jones' children; someone Ms. Black knew as "KT," who was the father of Jones' children; Shannon Jackson, Jones' uncle; Lauren Hamilton, Mr. Hamilton's sister; and Tina Starks, who was Mr. Wickliffe's cousin.[2]

¶ 6    Ms. Black stated that she arrived at Ms. Jones' apartment around 7 p.m. She drank "two cups of Hennessy" and was drunk but not so drunk she could not remember what happened. Sometime after midnight, Mr. Jackson argued with KT regarding his and Ms. Jones' children. The argument "spilled out" to a parking area behind the apartment building. Ms. Black and others followed. The parking area led to an alley, and Ms. Black saw Mr. Wickliffe and Ms. Starks walk down the alley away from the party. Mr. Jackson and KT started fighting and others tried to break it up. Mr. Hamilton stood near the gangway to the front of the building, uninvolved in the fight.

¶ 7    While Mr. Jackson and KT fought, Mr. Wickliffe and Ms. Starks returned from the alley. Mr. Wickliffe walked past the fight and approached Mr. Hamilton, who was four feet away from

---

[1] Some of the witnesses did not know the victim's last name and referred to him only as "Mikey." As his identity is not at issue, we will refer to him as Wickliffe.

[2] As defendant and Lauren Hamilton share a surname, we refer to Lauren by her first name. KT's full name is Kyran Wickliffe; as he and the victim share a surname, we will refer to him as KT, as did the witnesses throughout trial. Further, although none of the witnesses provided Tina Starks's full name, the parties stipulated to her full name and her identity is not at issue.

Ms. Black. As he walked, Mr. Wickliffe held his left hand behind his back and his right hand at his side. Ms. Black saw nothing in his hands and had not seen him with a weapon that evening. She testified that Mr. Hamilton raised his shirt and displayed a firearm in his waistband to Mr. Wickliffe who responded by asking him whom he would "bust at," meaning whom would he shoot.

¶ 8    Mr. Hamilton then shot Mr. Wickliffe twice. He stumbled backward, holding his side, and fell. Ms. Black saw him bleeding from the side of his stomach and she still saw nothing in his hands. She saw Mr. Hamilton shot him two more times and then ran through the gangway towards the street.

¶ 9    Ms. Black and Lauren ran to Lauren's vehicle, which was parked on the street. They entered and Lauren began to drive away but "got stuck." KT approached and banged on the window. He asked where Mr. Hamilton was and stated he had killed Mr. Wickliffe. Lauren drove away, then pulled over and switched spots with Ms. Black, who took over driving. Lauren then received a phone call that played over the vehicle's speakers. Ms. Black recognized the caller's voice as Mr. Hamilton's. He stated he was okay and told Lauren to retrieve his firearm, which he had left in some bushes. Neither Ms. Black nor Lauren attempted to do so.

¶ 10   On cross-examination, Ms. Black testified that Mr. Wickliffe was drunk but not "sloppy drunk" and was "still alert." There was one vehicle parked behind Ms. Jones' apartment building the night of the shooting. Mr. Hamilton was on the opposite side of the vehicle from KT and Mr. Jackson's fight. He was in a "corner" near the trash can and the fence. Ms. Black confirmed that Mr. Wickliffe was "much bigger" than Mr. Hamilton. She stated that Mr. Wickliffe walked "right next" to Mr. Hamilton, so they were "face to face." She agreed the events "happened quickly" and she heard Mr. Wickliffe say "taunting words" as he approached.

¶ 11    Mr. Jackson testified that during the get-together, he drank "a shot or two" of alcohol and smoked marijuana. He noticed that Mr. Wickliffe and KT had arrived together. When they did, "[e]verything just changed," including "the tension, the scenario, the vibe." Mr. Jackson heard that Mr. Wickliffe was "acting erratically," punching the walls and refrigerator. He saw dents on the refrigerator. Ms. Jones wanted Mr. Wickliffe to leave, so Mr. Jackson told KT to remove him from the home. Mr. Jackson and KT began arguing. Mr. Wickliffe then left with a woman and walked down the alley. Mr. Hamilton told Mr. Jackson that he did not like Mr. Wickliffe because he had taken a firearm from him before. At some point that evening, he saw a handle of a firearm protruding from Mr. Hamilton's waistband.

¶ 12    Mr. Jackson left the apartment and went to the parking area and continued to argue with KT. Their argument became physical. During the fight, Mr. Jackson heard five to seven nearby gunshots. He and KT stopped fighting, and he saw Mr. Wickliffe bleeding in the grass near the parking area. He did not see Mr. Hamilton. He had not seen anyone besides Mr. Hamilton with a weapon.

¶ 13    On cross-examination, Mr. Jackson testified that Mr. Wickliffe arrived drunk and continued to drink. He made everyone uncomfortable. Mr. Jackson agreed he had previously told detectives that Mr. Wickliffe argued with him, Ms. Jones, and his wife or girlfriend. Mr. Wickliffe was punching the walls and the "styrofoam, plastic refrigerator." Mr. Jackson was upset with KT for bringing him and not removing him as he was endangering KT and Ms. Jones' children.

¶ 14    KT testified that he and Mr. Jackson got into a verbal disagreement inside Ms. Jones' apartment. He, Mr. Wickliffe, and Ms. Starks then exited the apartment, descended the back stairs, and approached Ms. Starks' car, which was parked in the rear parking area. He and Mr. Jackson

continued to argue, while everyone that was inside the apartment followed. When KT reached the alley, Mr. Wickliffe was arguing with Mr. Jackson but never said anything to Mr. Hamilton. Ms. Starks walked Mr. Wickliffe into the alley to calm him. Mr. Jackson then ran to Mr. Hamilton, who was standing in the alley. Mr. Jackson tried to take Mr. Hamilton's firearm, but he did not give it to him. KT saw Mr. Hamilton with the firearm. Mr. Jackson and KT then began "grabbing" each other, but did not exchange punches.

¶ 15    Less than a minute after they had entered the alley, Mr. Wickliffe and Ms. Starks returned. Ms. Starks encouraged KT and Mr. Wickliffe to enter her car and leave. Mr. Wickliffe and Ms. Starks were on the other side of the vehicle from KT and Mr. Jackson. Mr. Hamilton stood near the gate to the gangway leading to the front of the building. He and Mr. Wickliffe were arguing, but KT could not hear what they said. Mr. Hamilton and Mr. Wickliffe were seven or eight feet apart. Mr. Wickliffe walked towards Mr. Hamilton and Ms. Starks tried to stop him.

¶ 16    KT then heard gunshots, ducked, and looked up. He saw Mr. Wickliffe step towards Mr. Hamilton and fall. Mr. Hamilton then fired towards the ground while "stepping back." He fired five or six shots. Ms. Starks' vehicle blocked KT's view of what Mr. Hamilton shot towards. Mr. Hamilton then ran down the gangway towards the front of the building. KT saw Mr. Wickliffe lying face down on the ground. KT chased Mr. Hamilton but he had entered a vehicle by the time KT reached the front of the building. He had not seen anyone beside Mr. Hamilton with a firearm. He did not see Mr. Wickliffe with any weapons. KT explained that Mr. Wickliffe sometimes carried a knife that would be visible on his side, but KT did not see him carrying the knife that night.

¶ 17    On cross-examination, KT testified that when he began arguing with Mr. Jackson, Mr. Wickliffe intervened. Mr. Wickliffe grew hostile and KT and Ms. Starks "got him out of the apartment." KT could not see what was in Mr. Wickliffe's hands as he approached Mr. Hamilton. KT saw sparks when Mr. Hamilton shot towards the ground. He agreed that Mr. Hamilton was walking backwards.

¶ 18    Mr. Hamilton had shown KT his firearm before and "always" kept it on him. Mr. Wickliffe "like[d] knives" and KT agreed he sometimes carried "a holster knife." Mr. Wickliffe was also nicknamed "Pistol." KT "guess[ed]" that was because he also carried pistols. KT was with Mr. Wickliffe all that day and never saw him with a weapon.

¶ 19    The medical examiner's report, which was entered into evidence, indicated Mr. Wickliffe was 35 years old, 5'8" tall, and weighed 238 pounds. He suffered "many wounds caused by projectile and/or projectile fragments." Some were "associated with abrasions that appear graze-like." There were more than 20 gunshot or gunshot particle wounds with crossing and commingled pathways which could not be determined. There were six gunshot wounds with discernable pathways, including two on his right buttock that traveled "right to left, back to front and upward." He died of multiple gunshot wounds and the manner of death was homicide.

¶ 20    The State entered stipulations that evidence technicians recovered from the scene nine fired cartridge cases, one fired bullet, several metal fragments, and a "black metal serrated knife" with a suspect blood stain. According to Ms. Black's testimony, the knife was several feet from where Mr. Wickliffe fell in the opposite direction from where Mr. Hamilton had stood. A technician also recovered from Mr. Wickliffe's body a "black belt buckle, suspect knife sheath." Forensic scientists would testify that the knife had no fingerprint impressions suitable for comparison, a

DNA profile from blood on the knife matched Mr. Wickliffe, and a mixture of DNA profiles on the knife's handle was unsuitable for comparison.

¶ 21    Mr. Hamilton testified that he was a cousin of KT and Mr. Wickliffe. He knew Mr. Wickliffe as "Pistol" because Mr. Wickliffe "always" carried firearms. The party at Ms. Jones' changed when Mr. Wickliffe arrived. He was intoxicated and stumbling. He argued with the mother of his children. Other people started arguing too, but Mr. Hamilton did not argue with anyone. The arguments spilled outside. Mr. Hamilton stood alone "in the corner with [his] back against the gate," while KT and Mr. Jackson fought.

¶ 22    Mr. Wickliffe entered the alley, walking away from the fight. He and Ms. Starks then returned, and he had "rage in his eyes." He did not stop to help KT in his fight with Mr. Jackson, but "started charging" towards Mr. Hamilton, "moving swiftly." Mr. Wickliffe was bigger and older than him. Mr. Wickliffe asked if Mr. Hamilton would "bust" at him, as if he were going to "blow" at him. Mr. Hamilton warned Mr. Wickliffe not to approach him, but he continued charging at him. Mr. Wickliffe's left hand was under his shirt and his right hand was at his side. Mr. Hamilton believed he had a firearm. He thought Mr. Wickliffe was "too close," and he believed he would die. Because he could not run as his back was on the gate, he had to "think fast." He drew his firearm and shot Mr. Wickliffe. Counsel asked whether he shot Mr. Wickliffe because he saw Mr. Wickliffe had a firearm. Mr. Hamilton answered that was "exactly" why he shot him.

¶ 23    After the shooting, Mr. Hamilton left the scene. He did not remember where he went as it was "too long ago." He ultimately moved to Las Vegas because he, his wife and children received death threats. He was there about a year and eight months before being arrested and extradited to Chicago. He spoke with detectives and denied knowing Mr. Wickliffe or being at the party as he

feared the police would "switch [his] words around." At the time of the shooting, he had a valid Firearm Owners Identification (FOID) card.

¶ 24    On cross-examination, Mr. Hamilton testified that he drank one cup of Hennessy at the party. He did not argue with Mr. Wickliffe in the apartment. KT and Ms. Starks escorted Mr. Wickliffe through the back of the apartment, and from the top of the back stairs, Mr. Hamilton saw Ms. Starks and Mr. Wickliffe in the alley. He testified that Ms. Starks handed Mr. Wickliffe a silver firearm.

¶ 25    Although Mr. Wickliffe was stumbling when he arrived at the party and continued drinking, a few hours passed before he charged toward Mr. Hamilton. Mr. Wickliffe held the firearm in his left hand. He asked Mr. Hamilton whom he would "bust at" before he showed Mr. Wickliffe his firearm. Mr. Wickliffe was about 10 feet away when he shot him. He only remembered firing at Mr. Wickliffe twice. Mr. Hamilton did not remember continuing to shoot at Mr. Wickliffe when he was on the ground as "[i]t happened so fast." Mr. Hamilton did not remember what he did with his firearm.

¶ 26    The defense stipulated that Mr. Wickliffe had been born in July 1980 and was convicted in 2009 of unlawful use of a weapon by a felon and sentenced to four years' imprisonment. Mr. Hamilton was born in May 1996 and, at the time of his arrest, weighed 150 pounds.

¶ 27    The trial court found Mr. Hamilton guilty of second-degree murder. The court found his testimony that Mr. Wickliffe had a firearm incredible and "self-serving." Mr. Wickliffe acted erratically and aggressively but the court believed Mr. Hamilton had "options," and could have left the party if he sensed trouble. When Mr. Wickliffe approached and spoke "a little bit aggressively," Mr. Hamilton "jumped the gun" and killed him. The court found that Mr. Hamilton

may have felt threatened, but his use of deadly force was unjustified. The court then denied his motion for a new trial.

¶ 28     Mr. Hamilton's presentence investigative report (PSI) indicated that he had just turned 20 years old at the time of the offense. He dropped out of high school during his junior year. He dated his girlfriend since 2014, and they had three children. He had a juvenile disposition for unlawful use of a weapon in 2012. In 2015, he was found guilty of retail theft and received one year of court supervision. He did not know his father and his upbringing was "rough" and "unstable," as he sometimes lived in shelters or was homeless and sometimes lacked food or clothing. He had worked for eight months as a doorman but left the job as he made more money trading stocks online. He self-reported a problem with alcohol and drank every day between the ages of 13 to 21. He also smoked marijuana every day but denied any problem with drugs.

¶ 29     At the sentencing hearing, the State published 10 victim impact statements from Mr. Wickliffe's family, including three of his children, and a picture drawn by his nephew. In aggravation, the State argued that Mr. Wickliffe was "terribly missed" by his family, and Mr. Hamilton did not act in self-defense, testified falsely, and shot Mr. Wickliffe as he lay on the ground. The State requested a sentence on the "high end" of the 4-to-20-year range.

¶ 30     In mitigation, defense counsel argued that Mr. Hamilton acted in self-defense and was sorry for Mr. Wickliffe's family. Mr. Wickliffe had been armed with a knife and Mr. Hamilton had been "retreating" when he fired at him. When the shooting occurred, Mr. Hamilton had worked as a "bellman in the Gold Coast area." He also earned income from trading stocks. Counsel entered into evidence a photograph showing that defendant, referred to as "Tom III," had been highlighted in a news article for working as a doorman alongside "Tommy Williams Sr." and "Tom Jr." After

the shooting, he moved to Nevada as he received death threats. Counsel entered into evidence several photographs showing social media posts in which people stated that someone should kill him. Counsel noted his lack of criminal history and that he had three young children. Counsel requested a sentence towards the minimum. In allocution, Mr. Hamilton apologized to Mr. Wickliffe's family and stated he wished the events had never happened.

¶ 31    The trial court imposed a sentence of 15 years' imprisonment on one merged count of second-degree murder. The court believed Mr. Hamilton that he wished the events never happened as he "destroyed" his own family in addition to Mr. Wickliffe's, which was "very tragic." It noted that, from the victim impact statements, it knew the lives of Mr. Wickliffe's family members had been changed forever. It also noted it had heard the circumstances at trial and, while people did many "regrettable" things at the party, Mr. Hamilton was the only one armed with a firearm. It believed his offense was closer to first degree murder than justifiable self-defense. The court had read the PSI and acknowledged that he had minimal criminal history, was a stock trader, did not know his father, and "grew up very poor." However, he exercised "terrible" judgment in shooting Mr. Wickliffe. He had "been acting in a very anxious manner in court," and the court did not believe he had testified truthfully. The court noted it had "to balance all this," and hoped to "bring some closure" to Mr. Wickliffe's family, although it could not "bring [Mr. Wickliffe] back." The court denied Mr. Hamilton's motion to reconsider sentence. Mr. Hamilton now appeals.

¶ 32                                    II. ANALYSIS

¶ 33    We note that we have jurisdiction to consider this matter, as Mr. Hamilton filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017); see also *People v. English*, 2023 IL 128077, ¶ 25.

¶ 34    On appeal, Mr. Hamilton argues that the State failed to prove him guilty of second-degree murder. He contends that his use of deadly force against Mr. Wickliffe was justified as self-defense. When a defendant challenges the sufficiency of the evidence, the question is "whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Sauls*, 2022 IL 127732, ¶ 52. It is the factfinder's responsibility to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Accordingly, a reviewing court will not retry the defendant or substitute its judgment for the factfinder's on the weight of the evidence or credibility of witnesses. *Id.* We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.* We must allow all reasonable inferences from the record in favor of the State. *People v. Grayer*, 2023 IL 128871, ¶ 32.

¶ 35    To prove first degree murder, the State must prove a person, without lawful justification, intentionally or knowingly performed an act which causes another's death, or knew the act created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2016). One lawful justification for first degree murder is self-defense. 720 ILCS 5/7-1(a) (West 2016) (a person is justified in using force when and to the extent that he reasonably believes it necessary to defend against the imminent use of unlawful force). Self-defense is an affirmative defense that, once raised, the State must disprove beyond a reasonable doubt, while also proving the elements of the charged offense. *People v. Shelly*, 2024 IL App (3d) 220432, ¶ 43. A person is only justified in using force that is intended or likely to cause death or great bodily harm "if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or

another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2016). A reasonable belief means "the person concerned, acting as a reasonable man, believes that the described facts exist." 720 ILCS 5/2-19 (West 2016).

¶ 36    The elements of self-defense are (1) a threat of unlawful force; (2) the person threatened was not the initial aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary to prevent the threat of unlawful force; (5) the person threatened actually and subjectively believed a danger existed that required the use of force applied; and (6) the beliefs of the person threatened were objectively reasonable. *People v. Gray*, 2017 IL 120958, ¶ 50.

¶ 37    Second-degree murder is a lesser-mitigated offense of first-degree murder. *People v. Wilmington*, 2013 IL 112938, ¶ 48. A person commits second degree murder when he commits first degree murder but, at the time of the killing, unreasonably believes the circumstances to be such that, if they existed, would justify or exonerate the killing. 720 ILCS 5/9-2(a)(2) (West 2016).

¶ 38    One form of second-degree murder is known as imperfect self-defense, and "occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." (Internal quotation marks omitted.) *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 148. Under this theory, if the State proves the elements of first-degree murder and negates an element of the defendant's claim of self-defense, the court may consider whether the defendant mitigated the offense to second degree murder by proving by a preponderance of the evidence that he believed his use of deadly force was justified but his belief was unreasonable. 720 ILCS 5/9-2(c) (West 2016); *Castellano*, 2015 IL App (1st) 133874, ¶ 149.

¶ 39    Mr. Hamilton was ultimately found guilty of second-degree murder under an imperfect self-defense theory. The trial court found that the State proved the elements of first-degree murder

and negated at least one element of self-defense. The court also found that Mr. Hamilton proved by a preponderance of the evidence that he believed his use of force was justified, but the court found that his belief was unreasonable. On appeal, Mr. Hamilton disputes that his belief was unreasonable, arguing that he acted in self-defense.

¶ 40     When a defendant asserts a self-defense claim, it is the factfinder's responsibility to assess the witnesses' credibility, the weight to be given their testimony, the inferences to be drawn from the evidence, and to resolve any conflicts or inconsistencies in the evidence. *Gray*, 2017 IL 120958, ¶ 51. On review, we must view the evidence in the light most favorable to the State and ask whether any rational factfinder could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Id.*: see also *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 87 (whether defendant acted in self-defense is determined by factfinder and only disturbed if evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt). In this case, we find that the evidence was sufficient for a factfinder to conclude that Mr. Hamilton's belief that his use of force was necessary was objectively unreasonable.

¶ 41     Initially, a rational trier of fact could find the State proved Mr. Hamilton guilty of first-degree murder. Ms. Black and Mr. Hamilton testified that Mr. Hamilton shot Mr. Wickliffe twice. KT and Mr. Hamilton testified that it was from 7 to 10 feet away. Ms. Black and KT further testified that, after Mr. Wickliffe fell, Mr. Hamilton shot at him multiple times. Nine cartridge cases were recovered from the scene and Mr. Wickliffe suffered more than 20 gunshot or gunshot particle wounds. A rational trier of fact could find Mr. Hamilton intentionally or knowingly performed an act causing Mr. Wickliffe's death or knew the act created a strong probability of death or great bodily harm. See 720 ILCS 5/9-1(a)(1), (2) (West 2016) (first degree murder

requires proof the defendant intentionally or knowingly performed an act causing another's death or knew the act created strong probability of death or great bodily harm).

¶ 42    In arguing that his use of force was necessary, Mr. Hamilton notes that Mr. Wickliffe was known to be fond of firearms and knives, being nicknamed "Pistol." In fact, Mr. Hamilton had told Mr. Jackson that Mr. Wickliffe had, at some prior time, taken a firearm from him. He also had been convicted of unlawfully possessing a firearm. On the day of the incident, he had been asked to leave the party as he was drunk and behaved combatively. As a result, Ms. Starks had to walk him into the alley to calm him. Nevertheless, when he returned from the alley, he immediately approached Mr. Hamilton, who was younger and smaller. Mr. Hamilton testified that Mr. Wickliffe had "rage in his eyes," as he approached him as his back was to the gate and continued approaching even after Mr. Hamilton showed he was armed.

¶ 43    While Mr. Hamilton argues that the evidence indicated that Mr. Wickliffe was armed with the knife as he approached him, he did not testify that he shot him because he believed Mr. Wickliffe was armed with a knife. Rather, he testified that he shot Mr. Wickliffe because Mr. Wickliffe was holding a firearm. Mr. Hamilton argues that while he may have been mistaken about the type of weapon with which Mr. Wickliffe was armed, the evidence suggests he was armed nevertheless, and it is his "perception of danger, not the actual peril, which is dispositive." (Internal quotation marks omitted.) *Harmon*, 2015 IL App (1st) 122345, ¶ 108.

¶ 44    Mr. Hamilton, however, did not merely testify that he saw Mr. Wickliffe holding a firearm. He testified that he saw Ms. Starks hand Mr. Wickliffe the firearm in the alley. The video taken in the alley shows no such event, and no firearm was found on Mr. Wickliffe's person or near his body. Ms. Black testified that Mr. Wickliffe's hands were empty as he approached Mr. Hamilton

and while he lay on the ground after being shot. It was therefore reasonable for the court to find Mr. Hamilton's testimony inaccurate and self-serving. Indeed, we may not disturb that determination. *Sauls*, 2022 IL 127732, ¶ 52.

¶ 45 Mr. Hamilton correctly notes he need not have exercised "infallible judgment" to establish self-defense. (Internal quotation marks omitted.) *Harmon*, 2015 IL App (1st) 122345, ¶ 55. Nor was he required to retreat from Mr. Wickliffe. See *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 36 (noting it is well-established that a person who is not the initial aggressor has no duty to retreat). However, to establish self-defense, the defendant must exercise "reasonable judgment under the existing circumstances." (Internal quotation marks omitted.) *Harmon*, 2015 IL App (1st) 122345, ¶ 55; see also *Gray*, 2017 IL 120958, ¶ 50 (belief that use of force applied was necessary must be objectively reasonable).

¶ 46 Additionally, despite there being no duty to retreat, the ease of a defendant's escape from his assailant may support a conclusion that it was unreasonable to believe that deadly force was necessary. *People v. Martinez*, 4 Ill. App. 3d 1072, 1076 (1972). Here, the photographs and testimony show that, as Mr. Wickliffe approached Mr. Hamilton, there was a gangway at Mr. Hamilton's back through which he could have escaped. In fact, after the shooting, he ran through that gangway to the street in front of Ms. Jones' apartment building and entered a vehicle, before KT reached the front of the building.

¶ 47 Most significantly, viewing the evidence in the light most favorable to the State, we find that even if Mr. Hamilton's initial use of force may have been justified given the evidence that Mr. Wickliffe possessed a knife while advancing towards him, a rational factfinder could find it was unreasonable to continue shooting at Mr. Wickliffe once he fell. "Where the initial use of deadly

- 15 -

force was justified, a claim of self-defense will not necessarily be negated by the fact that several shots were fired, or that the last shot was fired after the attack was over, since the party assailed is not expected to have perfect judgment." *People v. Shipp*, 52 Ill. App. 3d 470, 477 (1977); see also *People v. White*, 87 Ill. App. 3d 321, 323 (1980) (question is whether defendant reasonably responded to "quickly unfolding events"). However, a defendant may act unreasonably by continuing to apply force when it is no longer necessary. See *People v. Dickey*, 2011 IL App (3d) 100397, ¶ 15 (defendant could not reasonably believe that victim lying on ground created danger requiring continued application of force).

¶ 48    In this case, the evidence showed that Mr. Hamilton continued to fire after Mr. Wickliffe had fallen. The medical examiner's report confirmed two gunshot wounds were in his buttock, establishing that Mr. Hamilton shot at Mr. Wickliffe as he lay face down. The black serrated knife was found several feet from where Ms. Black testified Mr. Wickliffe fell and was out of his reach. Thus, a rational factfinder could find it was not objectively reasonable to believe that continued force was necessary. See *Shipp*, 52 Ill. App. 3d at 476 (a person is not justified in shooting an antagonist after the antagonist "has been disarmed and disabled" (internal quotation marks omitted)).

¶ 49    Further, as the State points out, Mr. Hamilton's own conduct following the shooting created facts that could lead a reasonable person to find that his actions were unreasonable. He fled the scene, and as Ms. Black testified, phoned her stating that he threw his firearm in some bushes. He then left the jurisdiction, moving to Las Vegas. He later denied to the police that he had been at the party or that he knew Mr. Wickliffe. These actions and untrue statements suggested a consciousness of guilt and undercut his self-defense claim. See *People v. Wilburn*, 263 Ill. App.

3d 170, 178-79 (1994) (reviewing second degree murder conviction and finding that flight from scene and disposal of murder weapon "belie[d] [the defendant's] claim that she acted reasonably in self-defense").

¶ 50    Mr. Hamilton argues he fled the scene to escape KT and moved out of the area because he had received death threats. The trial court, however, was not required to disregard the reasonable inferences that his actions stemmed at least in part from a knowledge that he lacked justification to shoot Mr. Wickliffe, coupled with his lies to the police and trial testimony about Mr. Wickliffe possessing a firearm when none was present. See *Sauls*, 2022 IL 127732, ¶ 52 (reviewing court must draw all reasonable inferences in favor of State and may not reweigh credibility determinations).

¶ 51    In sum, we conclude that it was not error for the court to find that it was not objectively reasonable for Mr. Hamilton to believe that the continued force he used against Mr. Wickliffe was necessary. We therefore affirm the trial court's finding of guilt as to the charge of second-degree murder.

¶ 52    Next, Mr. Hamilton claims that the trial court abused its discretion by imposing an excessive sentence. The Illinois Constitution provides that, in imposing sentence, the court must balance "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The trial court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We give the court such deference as it is better positioned than us to consider factors such as "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." (Internal quotation marks omitted.) *Id.* at 212-13.

We will not reverse a sentence absent an abuse of discretion. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 53 Moreover, where a sentence is within the statutory limits prescribed for the offense, we presume it to be proper. *Id.* ¶¶ 46-47. We will only disturb such a sentence where there is an affirmative showing that the sentence varies with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *Id.* ¶ 46. We may not disturb a sentence merely because we would have weighed the sentencing factors differently. *Id.*

¶ 54 Mr. Hamilton was found guilty of second-degree murder, a Class 1 felony with a sentencing range of 4 to 20 years' imprisonment. 720 ILCS 5/9-2(d) (West 2016); 730 ILCS 5/5-4.5-30(a) (West 2016). The trial court imposed a 15-year sentence. As Mr. Hamilton's sentence is within the statutory range, we must presume that it is proper and will only disturb it if he shows that it greatly varies with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Knox*, 2014 IL App (1st) 120349, ¶¶ 46-47.

¶ 55 Pursuant to its constitutional duty to balance the retributive and rehabilitative purposes of punishment, a sentencing court must consider all factors in aggravation and mitigation. *People v. Hearring*, 2022 IL App (1st) 192064, ¶ 44. Factors in mitigation include: that the defendant "acted under a strong provocation"; "[t]here were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense"; the defendant lacked criminal history; the defendant's conduct resulted from "circumstances unlikely to recur"; and the defendant is the parent of a child whose well-being will be negatively affected by the defendant's absence. See 730 ILCS 5/5-5-3.1(a) (West 2022).

¶ 56    Mr. Hamilton contends the trial court abused its discretion by failing to adequately consider mitigating factors such as his youth, his difficult upbringing, his lack of criminal history, that he "acted under a strong provocation," and that his conduct resulted from circumstances unlikely to recur. However, the record shows otherwise. The court stated it had read the PSI, which contained Mr. Hamilton's age, family history, criminal history, and employment history. The court acknowledged that he had a minimal criminal history, traded stocks, did not know his father, and "grew up very poor." The court also noted it had heard the evidence, which is the basis for Mr. Hamilton's contentions, that he acted under a strong provocation and the circumstances leading to his conduct were unlikely to recur. The court also stated that it believed Mr. Hamilton's statement in allocution that he wished the events had never happened. Based on its statements, we cannot find that the court failed to consider mitigating factors. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67 (absent an affirmative indication to the contrary, we presume the trial court considered all mitigating evidence presented).

¶ 57    Moreover, in addition to this mitigating evidence, the court was also required to consider the factors in aggravation. *Hearring*, 2022 IL App (1st) 192064, ¶ 44 (Illinois Constitution requires "consideration of all the factors in aggravation and mitigation"). The trial court is not required to give less weight to the seriousness of the crime than the mitigating factors. Neither does the presence of mitigating factors alone require a minimum sentence. *Harmon*, 2015 IL App (1st) 122345, ¶ 123. Nor is the court required to recite and assign value to each factor it considered, when announcing its sentence. *People v. Williams*, 2019 IL App (1st) 173131, ¶ 21.

¶ 58    The court noted the impact of Mr. Hamilton's conduct on Mr. Wickliffe's family. It further noted it had heard the trial evidence and considered Mr. Hamilton's conduct closer to being first-

degree murder than justifiable self-defense. Those statements indicate that the court properly afforded greater weight to the seriousness of his conduct than the mitigating evidence. *Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 59    Ultimately, Mr. Hamilton's arguments equate to claiming that the trial court should have weighed the evidence differently. We may not disturb a sentence on that ground. *Knox*, 2014 IL App (1st) 120349, ¶ 46. Given that his sentence is within the statutory range, and he has not shown that the court erred by failing to consider the evidence in mitigation, we decline to find that the court abused its discretion and imposed an excessive sentence.

¶ 60                              CONCLUSION

¶ 61    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 62    Affirmed.